R. BRUCE RIPLEY and DORIS J. RIPLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ripley v. Commissioner
Docket No. 31445-83.
United States Tax Court
T.C. Memo 1987-114; 1987 Tax Ct. Memo LEXIS 110; 53 T.C.M. (CCH) 262; T.C.M. (RIA) 87114; February 25, 1987. Joe Alfred Izen, Jr., for the petitioners. Robert F. Geraghty, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In a statutory notice sent August 8, 1983, respondent determined deficiencies in petitioners' Federal income taxes for 1976 and 1979 and additions to tax as follows: Taxable Year
Additions to Tax,
I.R.C. 1954 [1]
Ended
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
12-31-76
$15,981
$2,397
$799
12-31-79
668,898
33,445
*112 The issues for determination are (1) whether certain income is taxable to petitioners or is income of certain trusts created by petitioners; (2) whether respondent correctly determined petitioners' income by use of the bank deposits method; (3) whether petitioners are entitled to deductions for business expenses; and (4) whether petitioners are liable for the additions to the tax determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation is incorporated in our findings by this reference. Petitioners were residents of Woodinville, Washington, at the time their petition was filed. Beginning in July 1976, R. Bruce Ripley (petitioner or Mr. Ripley) became involved in a tax shelter program in the form of sales of memberships in an organization known as the American Law Association (ALA) devised by Karl Dahlstrom (Dahlstrom), described in United States v. Dahlstrom,713 F.2d 1423, 1425 (9th Cir. 1983). In July 1976, petitioner joined the ALA and organized a local Washington State promotional and sales operation called the American Law Education Society (ALES). On July 28, 1976, petitioners began to implement their own *113 ALA program by executing one of a series of preprinted documents entitled Contract and Declaration of Trust (CDT). Under the CDT, a nominal creator, Bradley S. Martin, purported to create a Masterplan Trust (Masterplan) domiciled in King County, Washington, by trading $1 and 100 trust certificate units to petitioners in exchange for certain assets of petitioners. On the same day, Martin appointed Doris J. Ripley (Mrs. Ripley) as "first trustee" and Mrs. Ripley, in turn, appointed Mr. Ripley as "second trustee." The assets petitioners purportedly transferred to Masterplan included their personal residence and the surrounding 2.5 acres of land, household furnishings, appliances, a cut glass collection, cash, a registered quarter horse, eguestrian equipment, ALES, Northwest Diamond Financial Services (a proprietorship operated by petitioner), and Rainier National Bank accounts in the names of ALES and N.W. Diamond Financial Services. Petitioners had the sole signatory control over the said bank accounts at all time material to this case. On August 13, 1986, petitioners appointed Mr. Ripley "executive trustee" of Masterplan and "resolved that the Executive Trustee shall have sole *114 authority acting on behalf of all other trustees." According to petitioner, Masterplan was a domestic business trust organization established for the purpose of avoiding probate and gift, inheritance, and estate taxes. In July or August 1976, petitioner, doing business as ALES, began marketing the ALA program. Petitioner received compensation for recruiting new members into the ALA. From approximately July 28, 1976, through November 29, 1976, he deposited the proceeds from his ALA marketing activities and from his sole proprietorship known as Northwest Diamond Financial Services into the two Rainier National Bank accounts purportedly transferred by petitioners to Masterplan. In November 1976, petitioner traveled to the Turks and Caicos Islands to set up three so-called foreign trust organizations (FTO's). Following his arrival in the Turks and Caicos Islands, petitioner contacted Aubrey Smith, a resident of the islands. On November 29, 1976, petitioner caused the execution of three CDT documents purporting to create three FTO's domiciled in the Turks and Caicos Islands. Those FTO's were known as B & D Superior Trust Company (B & D), Admiralty Financial Services (AFS), and *115 Tales Company (Tales). The terms of the four CDT documents used by petitioners in creating Masterplan, B & D, AFS, and Tales were identical with the exception of designations contained therein with respect to the purported domicile of the trusts and the provisions that the laws of the respective domiciles were to govern in construing the powers of the trustees. The documents were preprinted prototypes of the CDT documents provided to all new ALA members at the training seminars, with blanks to be filled in by the members. Each of the CDT documents contained the following provisions: (a) Upon appointment of the trustee(s), the trust property was: assigned, conveyed, and delivered unto said Trustee(s), in Trust Irrevocable - who act as absolute owners and hold title as joint tenants in fee simple, and not as tenants in common, and to collectively act by virtue of this Declaration of Trust as a Board of Trustees under the collective name herein designated - certain properties, business projects, operations under way or contemplated, dealing in equities, formulae, entities, patents, copyrights, business good-will, desired to be engaged in by said Trustees. (b) The named trustee(s) *116 accepted the purposed conveyance of property set forth in the schedules attached to the CDT documents and agreed to: invest and reinvest the funds of said Trust Organization in such a manner as will increase the financial rating of the Trust Organization exercising their best judgment and discretion in accordance with the Trust minutes, making distribution of portions of the proceeds and income as in their discretion and according to the minutes, and upon final liquidation distributing the assets to existing certificate holders as their contingent rights appear * * *. (c) Concerning appointment and removal of trustees: a Trustee may resign or be removed from office by a resolution of the Board of Trustees unanimously concurred in * * * [and] the Trustees shall appoint or elect a successor by the unanimous concurrence of the remaining Trustees. * * * (d) The trustees' powers over the trust were to: do anything any citizen may do in any state or country. They shall, but not be limited to, continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion *117 for the benefit of this Trust Organization such as, viz: buy, sell or lease land for surface or mineral rights; buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits of any form, patents, trademarks or copyrights; buy, sell or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses, or other trading establishments or places of business of any kind; allocate funds derived from any source for charity, religion, education, research, accumulating, or other purposes, whether for immediate or future application, to be managed by specified Trustee, Trustees, or others, as designated by the Trustees' minutes; construct, buy, sell, lease or rent any type of real estate, improved or unimproved; advertise different articles or business projects; borrow money for any project, pledging the Trust Organization property for the payment thereof; hypothecate assets, property, or both; own stock in, or entire charters of corporations, or other properties, companies or associations as they may deem advantageous. RESOLUTIONS OF the Board of Trustees authorizing a special thing to be done shall be evidence that such act is within *118 its power. * * * (e) Concerning the duration and termination of the purported trusts, each was to continue: for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date. The Trustees may at their discretion, because of threatened depreciation in values, or other good and sufficient reason, liquidate the assets, distribute and close the Trust Organization at any earlier date determined by them. The Trust shall be proportionately and in a pro rata manner distributed to the Certificate Holders. As a result of various transactions entered into by petitioners between July 1976 and December 1976, circular relationships were established between petitioners and four trusts that can be illustrated as follows: [SEE ILLUSTRATION IN ORIGINAL] At all times relevant to this case, petitioners were in complete control of the above four trust organizations. No individuals other than petitioners had any proprietary, beneficial, or equitable interest in any of the organizations or their assets. Petitioners' motive in establishing the four trust organizations was to avoid tax on income from Mr. Ripley's ALA marketing and other activities. *119 From November 29, 1976, through December 31, 1979, petitioner's ALA marketing operations were purportedly conducted through the three FTO's. Beginning sometime in 1977 and continuing through December 31, 1979, petitioner conducted ALA 2-day seminars for the new members that he had recruited. During 1979, petitioner was the executive vice president of the ALA, second in status only to Dahlstrom, the founder and president of ALA. Prospective ALA members were required to pay petitioner a membership fee ranging from approximately $1,700 to $10,000 prior to attending the 2-day seminars. At the seminars, petitioner lectured new members on the "how-to's" of implementing the ALA program, and supplied prototype trust documents, copies of court decisions, and other legal materials to the new members. During the seminars, petitioner stressed the importance of keeping detailed records of financial activities but instructed the members on the use of the so-called "copy not" pen. If such a pen were used, information on the checks would not show up on a bank's microfilm copies. During 1976 and 1979, petitioners owned two quarter horses that they kept at their residence. Petitioner, a self-described *120 "frustrated cowboy," had an interest in horses all his life. In approximately 1973, petitioners built their residence on 2-1/2 acres of land in Woodinville, Washington. The site included facilities for stabling 4 horses, 2 acres of pasture with cross fencing, 4 paddocks, and an exercise ring. During 1976 and 1979, gross income from petitioner's ALA marketing and other activities was deposited in the two Rainier National Bank accounts and in accounts at Pacific National Bank of Washington (in the name of Tales), and Seattle Trust (in the name of ALES). All of the accounts were subject to petitioners' sole signatory control and were located at branch offices in the suburbs of Seattle, Washington, within approximately a 20-minute drive from petitioners' residence. During 1976 and 1979, petitioners made expenditures from the bank accounts for mortgage payments on their residence, maintenance, repairs, improvements, and property taxes on their residence, expenses connected with quarter horses, automobiles, a pickup truck, and a motor home, and petitioners' disability and medical insurance premiums. They also wrote checks to themselves and to cash from the above accounts, totaling *121 at least $166,863 during 1979. In addition, petitioner wrote checks totaling at least $79,500 to a business called The Meditator, owned by petitioner and James Jenkins. The checks drawn on the bank accounts during 1976 and 1979 were written with a "copy not" pen. Petitioners filed a 1976 joint individual income tax return on December 28, 1977. Petitioners' return for 1976 showed Mr. Ripley's occupation as "recruiter" and Mrs. Ripley's occupation as "housewife." They reported no wages, dividend, or interest income and a loss of $2,126, comprised of an $825 loss shown on Schedule E, Supplemental Income Schedule, and a loss of $1,301 shown on Schedule C, from the operation of a sole proprietorship called R. Bruce Ripley. Petitioners listed the principal activity of the proprietorship as "recruiter" and reported gross receipts of $9,790, less $1,554 as cost of goods sold and/or operations and $9,537 in other expenses, for a net loss of $1,301. Nowhere on the return was there any indication that petitioners were engaged in any kind of horse training or breeding activities during 1976. Petitioners timely filed a joint individual income tax return for 1979. Mr. Ripley's occupation *122 was shown on the 1979 return as "agent," and Mrs. Ripley's occupation was shown as "housewife." They reported dividend income of $452 and trust income of $1,047 received by Mrs. Ripley from the Bank of California, Trustee, and "agent fees" of $15,700. No horse activity was mentioned on the 1979 return. None of the trusts ever filed tax returns reporting income or claiming expenses for 1976 or 1979. On June 22, 1982, revenue agent Danny L. LaTurner wrote to petitioners informing them that an examination of their income tax liability for 1977 and 1978 had been assigned to him. LaTurner asked petitioners for certain information and requested that they sign a consent to extend the time to assess the tax for 1977 and 1978. Petitioner responded with a letter dated July 1, 1982, asserting various frivolous questions. On July 6, 1982, LaTurner issued and served summonses on various banks, seeking records for 1977 through 1981. Petitioners met with LaTurner in July 1982 but failed to produce any of the tax records; instead they challenged the authority of the Internal Revenue Service to examine their records. Their conduct thus caused LaTurner to seek enforcement of the summons in *123 the United States District Court for the Western District of Washington, thereby delaying production of the bank records until after March 5, 1984. Records ultimately produced were incomplete and included microfilmed copies that were illegible. By letter dated October 13, 1982, LaTurner informed petitioners that his examination would include 1976. On October 28, 1982, petitioners each signed identical documents entitled Notice of Revocation in which they purported to revoke their joint income tax returns for 1976 through 1979 and to cancel their signatures on those returns. At a meeting between petitioners and LaTurner in December 1982, petitioners refused to produce any records and reiterated their frivolous arguments. Petitioners never produced to LaTurner the documents necessary to a correct determination of their tax liability. On June 2, 1981, petitioner, Dahlstrom, and others were indicted in the United States District Court for the Western District of Washington in relation to the ALA program. Certain of the defendants, including petitioner, were convicted. On August 24, 1983, those convictions were reversed in United States v. Dahlstrom,713 F.2d 1423 (9th Cir. 1983). *124 Documents admitted into evidence at the criminal trial, however, were used by LaTurner to reconstruct petitioner's income by reference to bank deposits. As a result, LaTurner determined gross income for petitioner of $52,537 for 1976 and $1,345,829 for 1979. Those determinations were the basis of the statutory notice in issue in this case. The petition herein was filed November 7, 1983. It alleged error in general terms without setting forth any specific facts concerning petitioners' income or deductions for the years in issue. No specific expenses were claimed in the petition. No reference was made in the petition to petitioners' horse activities. On July 8, 1985, respondent sent petitioners an informal request for production of documents and for answers to certain questions. Petitioners failed to respond and, on July 19, 1985, respondent served a request for production of documents and interrogatories. By notice served July 23, 1985, the case was set for trial in Seattle, Washington, on October 21, 1985. Petitioners did not respond to any of respondent's discovery requests. On September 9, 1985, respondent moved the Court for orders compelling responses or imposing sanctions. *125 On October 21, 1985, the Court granted respondent's motions and ordered that, on or before November 20, 1985, petitioners answer the interrogatories and produce the documents set forth in respondent's request for production. Trial of the case was continued, and, by notice served January 6, 1986, was thereafter set for May 5, 1986. On December 16, 1985, after the time for compliance with the Court's order of October 21 had expired, petitioners filed a Motion for Enlargement of Time (to January 10, 1986) for Compliance with Tax Court's Discovery Order. On December 23, 1985, petitioners delivered certain incomplete bank records to respondent. On December 24, 1985, respondent filed a motion to impose sanctions by reason of petitioners' failure to comply with the order of October 21. In lieu of answering the interrogatories, petitioners had delivered to respondent an affidavit asserting frivolous arguments, a copy of which was filed with the Court in response to respondent's motion for sanctions. Both motions were heard on January 29, 1986. The Court declared petitioners' motion moot and ordered, in part: ORDERED: That on or before February 24, 1986, petitioners shall serve on *126 respondent and file with the Court a written offer of proof, setting forth a list of witnesses that petitioners will call at trial of this case, including a brief summary of the testimony of such witnesses, and copies of all documents that petitioners would introduce at trial of this case. * * * The motion of respondent for the sanction of dismissal was taken under advisement. On February 24, 1986, petitioners filed a list of witnesses but otherwise failed to comply with the Court's order of January 29. Respondent's motion for sanctions was heard on May 5, 1986. The Court declined to dismiss the case as a sanction but directed that records not produced by January 10, 1986, would be excluded to the extent necessary to avoid prejudice to respondent. Shortly prior to trial, LaTurner made adjustments to his bank deposits analysis. The revised analysis determined additional income for 1976 in the amount of $69,273.43, but respondent does not claim an increased deficiency. The revised bank deposit analysis determined unreported income for 1979 in the amount of $1,180,886.40. Respondent did not make any allowance for deductible expenses because he had not received any documentation *127 beyond illegible and incomplete canceled checks and had not received any information in time to verify the claimed expenses with the payees of the checks. Moreover, in LaTurner's experience with the ALA program, payees of checks sometimes returned proceeds of the checks to the payors. ULTIMATE FINDINGS OF FACT Petitioners had unreported income of $69,273.43 in 1976 and $1,180,886.40 in 1979. Petitioners failed to report on their 1976 income tax return gross receipts exceeding 25 percent of the amount reported on that return. Petitioner incurred various business expenses during 1976 and 1979. He did not, however, maintain complete or reliable records of those expenditures, such as invoices from the providers of goods or services. Petitioners' failure to timely file their 1976 income tax return was not due to reasonable cause. Petitioners underpaid their income taxes for 1976 and 1979 due to negligence or to intentional disregard of rules or regulations. OPINION Petitioners have the burden of proving that respondent's determination of their tax liability in the statutory notice *128 of deficiency is not correct. Welch v. Helvering,290 U.S. 111, 115 (1933); Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a). [2] Specifically with respect to deductions, taxpayers are required to maintain and present for examination books and records sufficient to establish their rights to the deductions claimed. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Interstate Transit Lines v. Commissioner,319 U.S. 590 (1943); section 6001.
In this case, petitioners failed to report their income or claim deductions on tax returns, failed to maintain or produce records that would establish the correct amount of their tax liability, deliberately raised frivolous objections to the examining agent and in response to Court orders, and failed to comply with Court orders. The Court denied respondent's motion to dismiss the petition as a sanction for failure to comply with those orders (see Rules 104(c) and 123). By the conclusion of the *129 trial, however, recognizing potential prejudice to respondent as a result of petitioner's failure to comply with the orders to produce records, followed by vague claims of expenses allegedly incurred, the Court acknowledged possible unfairness in refusing to grant respondent's motion to dismiss but stated: THE COURT: * * * we have gone through the trial now, so we decide it on the merits, except to the extent that Respondent will not be prejudiced by Petitioners' failure to comply with the Court's order * * * because there appear to be some new issues with respect to the expenses, I think that seriatim briefs would be best with Petitioner going first, so we get all of his contentions laid out clearly and carefully. * * * The record was also left open 30 days for further stipulation as to specific bank records to be produced by petitioners. On motion by petitioners, the time for filing briefs was thereafter extended. Petitioners' opening brief requested that the Court allow deductions supported by the evidence, but the brief nowhere set forth the specific types or amounts of the deductions claimed or references to the record where such deductions were supported. Assertions *130 made in the brief were contrary to or unsupported by specific evidence. The brief was otherwise inadequate, disorganized, and failed to comply with Rule 151(e). Over 4 months after the close of trial, petitioners filed a motion to deem stipulated bank records that were to be the subject of a stipulation due over 3 months earlier. That motion was denied as untimely and nonmeritorious. Petitioners totally failed to file a reply brief. On this entire record, it is again tempting to dismiss the petition and enter a decision against petitioners for the amounts determined by respondent. See Stringer v. Commissioner,84 T.C. 693, 704-708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). See also Dusha v. Commissioner,82 T.C. 592, 597-608 (1984); Brooks v. Commissioner,82 T.C. 413, 422-430 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Although the Court believes that dismissal would be within its discretion, it refrains from such action at this point, primarily because the statutory notice made no allowance for business expenses and respondent has not made *131 any concession of such expenses. [3]
Income
Status of the Trusts
Petitioners' total argument with respect to whether the income determined by respondent should be taxable to them or to the trusts is as follows: IV. INCOME FOR THE YEARS IN QUESTION RECEIVED BY ALES AND TALES ARE PROPERLY TAXABLE TO THOSE ENTITIES AS TRUSTS INDEPENDENT OF PETITIONERS. If the trusts utilized by Ripley had a "business purpose" as contemplated by the Ninth Circuit in Dahlstrom, then the trust should receive separate tax treatment. In Zmuda v. C.I.R. [731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982)], and in other cases since Zmuda, the Tax Court has so far found impermissible control by the taxpayers over the trust entities. In the *132 present case, compensation paid to Doris J. Ripley was reported on her separate income tax return for the year 1979. Additionally, Petitioners separated their own personal affairs from the business activities conducted by the trusts which operated at "arm's length." Thus, Petitioners are not liable for the asserted income which is properly taxable to ALES and TALES as trusts independent of Petitioners. Such an argument deserves little response. Petitioners have not distinguished their case from those in which the Court has found ALA trusts with identical terms and similar implementation not recognizable for Federal tax purposes. See Akland v. Commissioner,767 F.2d 618 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; Zmuda v. Commissioner,731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Professional Services v. Commissioner,79 T.C. 888 (1982). As in those cases, petitioners were the only trustees that exercised any control over the assets allegedly transferred by petitioners to the trusts. The bank accounts at all times remained under their signatory control. Moreover, the factual assertions *133 in the above portion of petitioners' brief are contrary to the evidence. Refuting the assertion that they maintained their "personal affairs" separate from the trust affairs, personal expenses were paid out of the trust bank accounts. Mrs. Ripley's income reported on the joint 1979 return does not relate to the ALA trusts. The "agent fees" reported appear to be Mr. Ripley's, inasmuch as he was shown on the return as the "agent." The only apparent purpose of any of the trusts was to receive income assigned by petitioner to the trusts in a futile attempt to avoid taxation on that income. Courts have repeatedly struck down such devices, and the same result must be reached here. See Zmuda v. Commissioner,731 F.2d at 1421. Bank Deposits Method
Where taxpayers fail to maintain adequate records, the existence and amount of their income may be proven by any method that will clearly reflect the taxpayers' income. Section 446(b); Holland v. United States,348 U.S. 121, 130-132 (1954); Harper v. Commissioner,54 T.C. 1121 (1970). *134 The use of the bank deposits method employed here has long been an accepted method of reconstructing a taxpayer's income. Nicholas v. Commissioner,70 T.C. 1057, 1064-1065 (1978); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Petitioners never provided complete bank records to respondent. Based on incomplete records that they did provide, however, respondent's agent removed all duplications that could be identified. The resulting computation showed unexplained deposits of over $69,000 for 1976 and over $1,180,000 for 1979. Those amounts were more than the income set forth in the statutory notice for 1976 and less than that set forth in the statutory notice for 1979. Petitioners have failed to show that any further reduction is warranted by the evidence. See Gobins v. Commissioner,18 T.C. 1159, 1168-1169 (1952), affd. 217 F.2d 952 (9th Cir. 1954). Statute of Limitations
Petitioners contend that the deficiency for 1976 is barred by the statute of limitations. As they acknowledge, *135 section 6501(e)(1)(A) provides an exception to the general 3-year statute of limitations where the taxpayer omits from gross income reported on a return an amount properly included therein which is in excess of 25 percent of the amount stated in the return. In such event, the tax may be assessed within 6 years after the return was filed. Respondent has the burden of proving the facts necessary to show that the 6-year period of limitations applies. Bardwell v. Commissioner,38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963). The evidence of bank deposits introduced in support of respondent's determination, however, satisfies that burden. The analysis by respondent's agent shows unreported income of over $69,000 for 1976, whereas the return belatedly filed by petitioners for 1976 reported gross receipts of less than $13,000. The return was filed in December 1977, and the notice of deficiency was sent to the taxpayers on August 8, 1983, within the 6-year period of section 6501(e). Expenses
ALA and Northwest Diamond
In applying the bank *136 deposits method, the Internal Revenue Service normally reduces the income determined by the appropriate tax deductions, exclusions, exemptions, and credits to which the taxpayer is entitled. See United States v. Helina,549 F.2d 713, 715 n.2 (9th Cir. 1977); Percifield v. United States,241 F.2d 225, 229-230 n.7 (9th Cir. 1957). In this case, petitioners were allowed two personal exemptions and a standard deduction (zero bracket amount for 1979). The expenses claimed on Schedule C of petitioners' 1976 return were allowed. No other deductions were allowed from the unreported income determined by respondent. Petitioner testified that some of the gross proceeds received for the sale of ALA memberships were paid to Dahlstrom and to other persons who sold some of the memberships. He stated that originally he and Dahlstrom split proceeds, and that Dahlstrom demanded payment in cash. At some unspecified point in time, commissions were paid to other persons on sales by them on a basis of 60 percent to the salesman, 20 percent to Dahlstrom, and 20 percent to petitioner. Petitioner failed to relate these percentages to any specific time periods, amounts, *137 sales, or salesmen. Similarly, petitioner testified that he and the trusts incurred expenses for rent, secretarial expense, printing, supplies, telephone, and automobile expenses for ALA and Northwest Diamond Financial Services (Northwest). Northwest was allegedly in the business of selling precious stones or metal in 1976. He did not present any corroborating invoices, receipts, agreements, or testimony. He did present check registers with columns for various types of expenses claimed, but the amounts could not be verified by respondent either because the check registers were belatedly produced or because backup documentation was not provided. Petitioner claimed travel expenses were incurred, but he totally failed to provide any substantiation as required by section 274. During his testimony, he was equivocal as to the nature of expenditures and was obviously guessing as to the purpose of some of them. Neither petitioner's testimony nor the registers permitted an allocation between deductible expenses relating to sales of ALA programs and personal expenses nondeductible by reason of section 262 or nondeductible because they related to petitioners' trusts. See Zmuda v. Commissioner,731 F.2d at 1421-1422; *138 Luman v. Commissioner,79 T.C. 846, 855-859 (1982). Petitioner attempted to introduce at trial purported summaries of his income and deductions. The Court refused to receive those summaries in evidence because they were not provided in accordance with the Court's order for production of documents and were tendered too late for respondent to conduct any meaningful determination as to their accuracy; no underlying documents were provided; the summaries were not keyed to any underlying documents; and they were otherwise unreliable. See United States v. Miller,771 F.2d 1219, 1238 (9th Cir. 1985); Davis & Cox v. Summa Corp.,751 F.2d 1507, 1516 (9th Cir. 1985); Paddack v. Dave Christensen, Inc.,745 F.2d 1254, 1259-1261 (9th Cir. 1984); see also Rules 106 and 1006, Federal Rules of Evidence.
Respondent argues that there is inadequate information to allow any deductions and emphasizes petitioners' misconduct. Petitioners had a duty to keep adequate records of their income and deductions and to present them for examination but repeatedly refused to cooperate. As characterized by respondent, petitioners ultimately *139 "opted for the recalcitrant stand of a tax protestor, challenging respondent's authority and attempting to revoke the subject tax returns." Petitioners failed to comply with the Court's orders and rules regarding discovery and preparation of stipulations of fact, choosing to wait until trial and limiting their evidence to incomplete bank records and vague generalized testimony. Finally, petitioner admitted that he used "copy not" pens to write checks to prevent disclosure of information relative to petitioners' bank accounts. Petitioners' predicament is unquestionably one of their own making. See Schellenbarg v. Commissioner,31 T.C. 1269, 1277 (1959); Estate of Wilson v. Commissioner,2 T.C. 1059, 1086 (1943). They did not set forth the expenses they now claim on any return, in their petition, in their responses to the Court's orders, or in their brief. From their failure to produce complete records, we might infer that they had additional unreported income offsetting any expense claims. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). As tempting *140 as it is to leave petitioners where we find them, and to sustain in full respondent's determination, we cannot close our eyes to the evidence that some business expenses were incurred. We must approximate those expenditures "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930); Gestrich v. Commissioner,74 T.C. 525, 531 (1980), affd. in an unpublished opinion 681 F.2d 805 (3d Cir. 1982). After careful consideration of the entire record, we conclude that our best approximation of the deductible expenses incurred by petitioners is 25 percent of their unreported income for each of the years in issue. Horse Activities
During trial and in their brief, petitioners claimed that expenses of their horse activities were deductible as business expenses. No such claim was made on their returns, in their petition, or at any time prior to trial. Petitioners have failed to prove that their horse activity was entered into with an actual and honest profit objective *141 and was not an activity not engaged in for profit as defined in section 183(c). Petitioners have failed to present any objective facts supporting a determination of the requisite profit objective, as described in section 1.183-2, Income Tax Regs. The testimony concerning the horse activities appears to be an afterthought, intended to overcome the inferences of commingling of personal and business uses of the trust known as Tales, disclosed by the belated production of records relating to that trust. Additions to Tax
Petitioners presented no explanation of their late filing of their 1976 tax return, and the addition to tax under section 6651(a) must be sustained. Petitioners' failure to keep or present records with respect to their income and deductions is contrary to regulations, section 1.6001, Income Tax Regs., and in itself is negligence. See Schroeder v. Commissioner,40 T.C. 30, 34 (1963). The ALA trust arrangement has, in some instances, supported an addition to tax for fraud. See Akland v. Commissioner,supra; *142 Professional Services v. Commissioner,supra.Petitioners have not in any way satisfied their burden of proving that the deficiencies here were not due to negligence. See Zmuda v. Commissioner,731 F.2d at 1422; Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Unless otherwise indicated, all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. The Court takes judicial notice of at least three other cases pending involving petitioners, including a case involving their liability for 1977 and 1978, Ripley v. Commissioner,T.C. Memo. 1985-555↩, and of many cases in which counsel of record for petitioners represents other taxpayers. Petitioners and their counsel should not expect such tolerance from the Court in the future.