GARY E. TATUM AND PATRICIA D. TATUM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tatum v. Commissioner
Docket No. 19348-86.
United States Tax Court
T.C. Memo 1988-579; 1988 Tax Ct. Memo LEXIS 608; 56 T.C.M. (CCH) 914; T.C.M. (RIA) 88579; December 27, 1988. Gary E. Tatum, pro se. David W. Johnson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax and additions to tax for the taxable year 1982 as follows: Additions to Tax
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661 [2]
$ 20,988.83
$ 1,049.94
*
$ 2,099.88
*611 The issues for our decision are (1) whether certain "trusts" [3] are recognizable for Federal income tax purposes and, if so, whether the income received by the "trusts" is taxable to petitioners under the grantor trust provisions of sections 671 through 677; (2) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2); (3) whether petitioners are liable for an addition to tax under section 6661; and (4) whether the Tax Court should award damages to the United States pursuant to section 6673. *612 FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated by this reference. Petitioners, Gary E. Tatum (hereinafter petitioner) and Patricia D. Tatum, resided in Jasper, Texas, at the time of the filing of the petition in this case. During 1982, Gary E. Tatum was a self-employed optometrist. In 1981, after learning of the tax shelter programs promoted by Karl L. Dahlstrom and the American Law Association (ALA), petitioner purchased a membership in the ALA for $ 10,000 for which he received a pre-packaged set of trust forms. Subsequent to purchasing the membership, Karl L. Dahlstrom instructed petitioner to contact Lascelle Tillett (Tillett), of Belize City, Belize, in order to implement the ALA trust plan. On January 24, 1981, in Belize City, petitioner, as "exchangor," and Tillett, a citizen of Belize, as "creator," executed three documents each entitled "Contract and Declaration of Trust" (the contract), in the names of East Texas Trust Company (Texas Trust), Good Times Holding Company (Good Times), and Eastex Optical Operating Company (Eastex). Tillett contributed no *613 property and exercised no control over the three respective trusts. The three trusts were organized as Belize common law business trusts pursuant to the contract for each. Each contract was identical in all respects with the exception of ownership of trust units and respective trustees. The creator, Tillett, appointed a trustee for each trust and such trustee was then empowered to appoint a secondary trustee. The contract authorized the trustee to elect officers, employees, and agents, and resolutions of a trustee were evidence that such act was within the power of the trustee. Each trust was to continue for a period of 25 years unless the trustee determined a shorter or longer period. Initial ownership of the respective trust units was established on January 24, 1981, as follows: Petitioner exchanged $ 100 for $ 1 and 100 trust units of Texas Trust; petitioner exchanged personal property for $ 1 and 100 trust units of Eastex and on January 30, 1981, petitioner sold 100 trust units of Eastex to Good Times for $ 50; and Texas Trust exchanged $ 50 for $ 1 and 100 trust units of Good Times. The minutes of Eastex evidence that the personal property transferred to Eastex by petitioner *614 consisted of equipment and supplies used by petitioner in the operation of his optometry practice. On January 24, 1981, Tillett appointed petitioner as first trustee of Texas Trust and petitioner appointed his wife, Patricia D. Tatum, as successor trustee. Tillett then appointed Texas Trust as trustee of Eastex and Good Times. Petitioner, as trustee of Texas Trust, appointed himself to the office of president of Eastex and Good Times on January 30, 1981. As trustee of Texas Trust, petitioner had complete control over Texas Trust, Good Times, and Eastex. The sole purpose for Texas Trust was to act as trustee of Good Times and Eastex. Petitioner had signatory authority on bank account number XXX 914, styled Eastex Optical Operating Co., from which petitioner paid for secretarial services, leasing of equipment, and purchasing of optical goods. Prior to establishing Eastex, petitioner personally employed the secretaries, owned the equipment, and purchased the optical goods directly from suppliers. Petitioners had signatory authority on bank account number XXX 138 styled Good Times Holding Co., into which money from Eastex was deposited and from which disbursements to petitioner *615 were made as gifts. During 1982, Patricia D. Tatum and/or Gary E. Tatum had signatory authority over the following checking accounts at the First National Bank of Jasper, Texas. Account No.
Signature Authority
Style of Account
XXX 211
Gary E. Tatum
Dr. Gary E. Tatum
XXX 199
Patricia D. Tatum and
Dr. or Mrs. Gary E.
Gary E. Tatum
Tatum
XXX 138
Patricia D. Tatum and
Good Times Holding
Gary E. Tatum
Co.
XXX 914
Gary E. Tatum
Eastex Optical
Operating Co.
430 835
Patricia D. Tatum
Patricia D. Tatum
During 1982, petitioner paid Eastex $ 13,500 pursuant to a lease agreement for equipment originally transferred to Eastex in exchange for $ 1 and 100 trust units. Payments made to Eastex for labor and materials purchased in 1982 totalled $ 36,850 and $ 100,192.63, respectively. On their 1982 Federal income tax return, petitioners claimed a deduction for "equipment lease" and calculated "cost of goods sold" for labor and materials in the above amounts. Deposits to bank account number XXX 914 during 1982 (less redeposits) totalled $ 154,687.35. For 1982, a Form 1040NR for Eastex was prepared and signed by petitioner and filed with the Internal *616 Revenue Service. Schedule C, attached to the Form 1040NR, reflected the following items: Gross Receipts
$ 154,687.25
Less:  Cost of Goods Sold
102,818.94
Total Income
51,868.31
Less Claimed Deductions:
Depreciation
$  4,125.37
Dues/Publications
250.00
Office Supplies/
Postage
650.35
Taxes
1,056.71
Royalty
41,000.00
Total Deductions
Claimed
47,082.43
Net Profit
$  4,785.88
The amount claimed as a "royalty" deduction is represented by checks totalling $ 41,000 drawn on bank account number XXX 914 payable to cash and Good Times Holding Co. and negotiated by petitioners. These "royalty" payments were recorded as income in the cash receipts and disbursements journal for Good Times and were the sole source of income for Good Times for the taxable year 1982. During 1982, the sole disbursements recorded in the cash receipts and disbursements journal for Good Times were loans, totalling $ 19,500 to petitioner and to Andrea Tatum (Andrea), petitioners' 16-year-old daughter. These loans occurred in the following manner: By letter dated as *617 of the date of the loan, addressed to Good Times, Andrea requested to borrow from Good Times a sum certain. During 1982, the dates and amounts requested by Andrea were: February 11, 1982, $ 3,500; March 5, 1982, $ 3,000; April 6, 1982, $3,500; May 5, 1982, $2,500; June 11, 1982, $ 2,000; and July 9, 1982, $2,000. Petitioner requested to borrow $3,000 on January 7, 1982. By letter, addressed to Andrea and signed by petitioner as president of Good Times, the requested loan was acknowledged and made (with the exception of the loan on February 11, 1982). Thereafter, Andrea executed a promissory note (note) in the amount of the requested loan and received the money from Good Times. The note was then transferred by Good Times to petitioner as a gift, and petitioner then demanded payment of the note from Andrea. Andrea would then pay petitioner the face amount of the loan. Andrea's actions with respect to each transaction were at the request and direction of petitioner. In each instance, this sequence of events took place on the same day. Each note provided that early demand would waive any accumulated interest; therefore, because the sequence of events to effectuate this process *618 took place on the same day, no interest was ever paid by Andrea. The funds received through this procedure were used by petitioner for various living expenses and none of it was reported as taxable income. The source of the loans to Andrea were from bank account number XXX 138, and from a "little box" located at the desk of petitioner's secretary. The source of the money located in the "little box" was Eastex. Of the $ 41,000 claimed by Eastex on Form 1040NR as a "royalty" deduction, a check for $ 14,500 drawn on bank account number XXX 914 payable to Good Times Holding Co. and dated October 25, 1982, is reflected as a $ 14,500 deposit on that same day to bank account number XXX 138. By a letter dated October 29, 1982, petitioner purportedly transferred First National Bank account number XXX 162 styled Good Times Holding Co. to Patricia D. Tatum as a gift, although that account was not opened until December 30, 1982, Patricia D. Tatum drew checks totalling $ 12,827 on bank account number XXX 138 for personal expenditures. Petitioners reported a tax liability of $ 8,030.85 on their 1982 joint Federal income tax return. The Commissioner mailed a notice of deficiency to petitioners *619 for the taxable year 1982. Consistent with his determination that the trusts were nullities for Federal income tax purposes, the Commissioner treated the income and expenses recorded on the books and records of Eastex as income and expenses of petitioners. In his notice of deficiency, the Commissioner determined that petitioners realized unreported income of $ 154,687 based upon gross receipts from petitioner's optometry services in the amount of $ 384,127.97 less receipts of $ 229,440.97, reported on petitioners' joint Federal income tax return. The unreported gross receipts were determined from the following analysis of bank account number XXX 914 styled Eastex Optical Operating Co.: First National Bank
Eastex Optical Operating Co.
Account #XX6914
Date of Deposit
Amount of Deposit
Source
1/29/82
$  1,350.00
Services
2/26/82
13,225.50
Services
3/31/82
16,981.13
Services
4/30/82
3,121.72
Services
5/28/82
12,594.60
Services
6/30/82
12,785.00
Services
7/30/82
17,629.62
Services
8/31/82
19,607.08
Services
9/30/82
-
-
10/30/82
23,468.38
Services
11/30/82
4,700.00
Services
$ 29,224.32 Services 12/31/82
36,224.32
7,000.00 Redeposit
Total Deposits
$ 161,687.35
Less: Redeposits
7,000.00
Rounding off
.35
Taxable Amount
$ 154,687.00
*620 The Commissioner allowed $ 102,818.94 as cost of goods sold and the following deductions: Depreciation
$ 4,125.37
Dues/Publication
250.00
Office Supplies/Postage
650.35
Taxes
1,056.71
Total
$ 6,082.43
The only deduction claimed by Eastex on the Form 1040NR not allowed by the Commissioner was the "royalty" payment of $ 41,000, which was money ultimately distributed to petitioners as gifts. As a result of increasing taxable income $ 45,786, the Commissioner allowed an investment tax credit of $ 453.05, rather than the $ 39.55 claimed on the return. The Commissioner also determined petitioners were liable for additions to tax pursuant to section 6653(a)(1) and (2) and section 6661. On June 14, 1987, respondent informed petitioners, by letter, of the provisions of section 6673 and of this Court's prior decisions regarding the validity of similar Dahlstrom trust organizations. In addition, the Tax Court warned petitioners of the possibility of awarding damages. OPINION The first issue for our decision is whether Texas Trust, Good Times, and Eastex are recognizable for Federal income tax purposes. The contention that these *621 trusts are "shams" is a recurring theme that we have applied and upheld in prior cases involving Dahlstrom trusts. Zmuda v. Commissioner,79 T.C. 714, 719-722 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Professional Services v. Commissioner,79 T.C. 888, 920-929 (1982). [4] Our decision will, therefore, rest upon whether the present factual situation is distinguishable from previous factual patterns involving similar trusts.
We pointed out in prior opinions some of the principles which courts have consistently applied to cases similar to the instant case. These principles are so well established that they need not be repeated because we enunciated them in detail in Zmuda v. Commissioner, supra, and in Professional Services v. Commissioner, supra, *622 and have continued to apply them uniformly in subsequent Memorandum Opinions. The Commissioner contends that the trusts which petitioners caused to be created should not be regarded as legal entities for Federal income tax purposes. He contends that they are shams. Prior to the taxable year 1982, the year before the Court, petitioner conducted his optometry business as a sole proprietorship. Petitioner organized business trusts under the laws of Belize using a pre-packaged set of forms purchased from ALA through which he conducted the identical business formerly conducted as a proprietorship. Petitioners argue that the transactions between the trusts and themselves should be recognized for tax purposes because this Court was reversed in Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). Petitioners go on to argue that the Court of Appeals held that "if there is a tax avoidance motive it does not follow that there is no economic substance and, therefore, you must look for economic substance or business activity." Petitioners then contend that the Tax Court has acquiesced *623 in petitioners' interpretation of the reversal and because their trusts engaged in business activities, they should be recognized for Federal income tax purposes. To begin with, Rice's Toyota was concerned only with sham transactions. The instant case is, instead, concerned with sham entities. This is not merely a distinction without a difference. When a court finds that the entities which the taxpayer created are shams then the transactions between such sham entities and others, including the taxpayers, are treated as having never occurred. Petitioners have mischaracterized the reversal of Rice's Toyota and have also mischaracterized the application of Rice's Toyota following the reversal. The Court of Appeals reversed this Court in only one aspect, i.e., the disallowance of the deduction of interest on the recourse debt. The Tax Court continues to apply the tests it enunciated in Rice's Toyota, e.g., Mukerji v. Commissioner,87 T.C. 926 (1986). Again we emphasize, however, the instant case does not involve sham transactions and the case law *624 which has developed from Rice's Toyota is not involved. The instant case will, instead, be decided by applying our prior decisions on Dahlstrom trusts, which we cited above. In our previous decisions regarding the use of similar Dahlstrom trusts, we found the trusts not recognizable for Federal income tax purposes because the creation and use of the trusts did not alter the taxpayers' economic relationship to the properties transferred to the trusts. Zmuda v. Commissioner, supra;Professional Services v. Commissioner, supra. The taxpayers retained complete control over the trusts and the transfers of property to the trusts did not alter the taxpayers' relationship to the properties in any way. The Dahlstrom trust documents, terms, conditions, organization, and operation in Zmuda and Professional Services are virtually indistinguishable from those in the instant case. The trusts were created by a third party who neither had, nor acquired, any power over the trusts. The control and proprietary rights rested completely with petitioner. As trustee *625 of Good Times and Eastex, Texas Trust was subject to the unrestricted control of petitioner. There was no independent fiduciary to enforce the terms of the trusts. In addition, petitioner owned, directly and indirectly, all of the trust units in all of the trust organizations. Therefore, petitioner had unrestricted authority to act in any manner with respect to the property transferred to the trusts. Petitioner's control over his optometry practice remained unchanged after the interposition of the Dahlstrom trusts. The only change brought about was the manner in which petitioners reported their income and the amount they reported. Under these circumstances, we decline to accord these Dahlstrom trusts any greater weight than we have done in the past. Petitioners' Dahlstrom trust scheme is devoid of economic substance. It is clear that petitioners' intent in establishing these trusts was solely to obtain tax benefits. Because we find that the trusts are to be treated as nullities for Federal income tax purposes, it is not necessary to address respondent's argument concerning the grantor trust rules. Petitioners argue that the facts of Professional Services are distinguishable *626 from the present factual situation. In Professional Services, an unsecured note providing for deferred interest and principal, in which it was understood from the outset that no amount would ever be required to be repaid, was ruled to be a mere paper liability without substance for tax purposes. Petitioners contend that none of these facts exist in the present factual situation. We disagree. It is clear that no true liability ever existed with respect to the notes signed by Andrea. As in Professional Services, the terms and circumstances of the loan, itself, clearly demonstrate that the loan was not bona fide. The note was signed by the 16-year-old daughter of petitioner, a minor in the State of Texas and thus, able to disclaim any liability on the obligation. Tex. Civ. Prac. & Rem. Code Ann. sec. 129.001 (Vernon 1986). No business purpose was ever shown for the gift of the note to petitioner and there was never any economic risk associated with the purported loans. Interest on the notes was waived due to the fact that demand and repayment occurred on the same day. The loans to Andrea and subsequent gifts of the notes to petitioner were just one step in a series of *627 interdependent steps which were focused upon funnelling money to petitioners tax free. [5]
Petitioners further argue that Zmuda was lost due to a mistake in judgment by the Zmudas' counsel, not because of the business trust arrangement entered into by the Zmudas. We need not waste the Court's time in addressing this frivolous argument. We must next consider petitioners' jurisdictional argument. Petitioners contend that even though the Tax Court may have subject matter jurisdiction over Good Times, it does not have "territorial" jurisdiction because Good Times is a nonresident alien that does not engage in a trade or business in the United States. Petitioners cite Helicopteros Nacionales De Colombia, S.A. v. Hall,466 U.S. 408 (1984), and Perkins v. Benguet Consolidated Mining Co.,342 U.S. 437 (1952), asserting *628 that there is no long-arm statute authorizing the exercise of jurisdiction by the Tax Court. The Tax Court is a court of limited jurisdiction, having only such jurisdiction as provided by statute. Commissioner v. Gooch Milling & Elevator Co.,320 U.S. 418 (1943); Burns, Stix Friedman & Co. v. Commissioner,57 T.C. 392 (1971). There are three statutory requirements which must be met to invoke the Tax Court's jurisdiction: (1) the Commissioner must determine a deficiency, sec. 6211(a); (2) notification must be made to the taxpayer of such deficiency determination, sec. 6212(a) and (b); and (3) the taxpayer must file a petition with the Tax Court for redetermination of the deficiency, sec. 6213(a). Thus, in most cases, it is the taxpayer who submits to the jurisdiction of this Court by voluntarily petitioning the Tax Court for redetermination of the deficiency determination. In redetermining a deficiency for any taxable year, the Tax Court has authority to consider all facts which relate to the deficiency determined by the Commissioner. Sec. 6214(b). *629 "The fact that we do not have jurisdiction to determine a particular taxpayer's liability does not preclude consideration of that taxpayer in relation to a determination of the liability of a taxpayer for which we do have jurisdiction." [6]
In the present factual situation, we do not have jurisdiction to decide the Federal income tax liability of Good Times, as the trust is not a party properly before us. However, to the extent relevant and necessary to correctly redetermine the amount of petitioners' deficiency, we may consider facts and issues relating to Good Times. "The fact that [the trusts] purported to be foreign business trusts does not give them vitality," Zmuda v. Commissioner, supra at 722, nor does it shield them from our analysis. Petitioners caused Good Times to be created and purported to have transactions with Good Times. We, therefore, reject petitioners' argument that we are without jurisdiction to consider issues relating to Good Times. Consistent with our holding that the *630 creation of Texas Trust, Eastex, and Good Times did not alter any cognizable economic relationship, we will look through the form and, instead, apply the tax law to the substance of the transactions. In substance, petitioners are the owners of the income and expenses recorded on the books and records of Eastex for 1982, and they are taxable on these amounts accordingly. Lucas v. Earl,281 U.S. 111, 114-115 (1930). To avoid duplication of income or expenses, the Commissioner has not disallowed any of the deductions claimed by petitioners on their 1982 joint Federal income tax return, Form 1040, which were identified as payments to Eastex. Rather, the gross receipts and the corresponding deductible expenses reported by Eastex were treated as income and expenses of petitioners. The Commissioner has not, however, allowed petitioners to deduct the $ 41,000 "royalty" payment claimed by Eastex, money which was ultimately distributed to petitioners. By attributing to petitioners the income and expense items of Eastex, the Commissioner determined that petitioners understated their gross income in the amount of $ 154,687 and understated their corresponding business expenses *631 in the amount of $ 108,901 and understated their corresponding investment tax credit in the amount of $ 413.50. Additions to Tax
The Commissioner determined that petitioners were liable for additions to tax for taxable year 1982 under section 6653(a)(1) and (2) and section 6661. Section 6653(a)(1)imposes an addition to tax in the amount of 5 percent of an underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes a further addition to tax in an amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence under section 6653(a)(1) and (2) is defined as lack of care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that the additions to tax determined by the Commissioner should not be sustained. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). *632 The record before us contains no evidence that petitioners exercised the care taken by a reasonable and ordinarily prudent investor. Based upon the large amounts of income from petitioner's optometry practice that was being sheltered from taxation, a reasonable and prudent investor would have made inquiries into the validity of the Dahlstrom trust scheme. We sustain respondent's additions to tax under section 6653(a)(1) and (2). Section 6661provides for an addition to tax for a substantial understatement of Federal income tax liability. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1)(A). Petitioners reported on their 1982 joint Federal income tax return a liability of $ 8,030.85. It is clear that petitioners' understatement was substantial. Section 6661(b)(2)(C)(ii)defines a tax shelter as: (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other *633 plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. Based upon the record before us, it is clear that the principal purpose of the Dahlstrom trust scheme is the avoidance of Federal income tax. Our holding that the Dahlstrom trust scheme is a tax shelter, within the meaning of section 6661(b)(2)(C), is consistent with prior opinions of this Court and of the Ninth Circuit. United States v. Dahlstrom,713 F.2d 1423 (9th Cir. 1983), cert. denied 466 U.S. 980 (1984). [7]
With respect to understatements attributable to a tax shelter item, section 6661(b)(2)(C)(i) provides for a reduction of the amount of the understatement only in cases where there is or was substantial authority for the treatment of an item by the taxpayer and the taxpayer must also have "reasonably believed" that the tax treatment of an *634 item was "more likely than not the proper treatment." Sec. 6661(b)(2)(B); sec. 6661(b)(2)(C)(i). Petitioners' reliance on the substantial authority standard is based upon distinguishing the present factual situation from Zmuda and Professional Services.However, section 1.6661-3(a)(2), Income Tax Regs., in defining "substantial authority" provides, "a position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would * * * not [satisfy] the substantial authority standard." In addition, in evaluating the authority, "the taxpayer's belief that the authorities with respect to the tax treatment of an item constitute substantial authority is not taken into account in determining whether there is substantial authority." Sec. 1.6661-3(b), Income Tax Regs. Finally, the weight of the authority, is determined by the same analysis that a court would be expected to follow in evaluating the tax treatment of the item. Thus, the weight of authorities depends on their persuasiveness *635 and relevance as well as their source. For example, a case or revenue ruling having some facts in common with the tax treatment at issue would not be considered particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue. [Sec. 1.6661-3(b)(3), Income Tax Regs.] Petitioners have failed in their burden of proving substantial authority for their position. The Dahlstrom trust scheme has been consistently invalidated by this Court and petitioners' arguments to distinguish these previous decisions from the instant case are without merit. Petitioners' theory regarding what counsel should have done in prior cases is not relevant. All relevant precedent weighs against petitioners' position, and the relative merits of those precedents demonstrate that the distinguishing characteristics relied upon were not of sufficient force to compel the treatment claimed. [8]
In addition, petitioners have not demonstrated that they "reasonably believed" that the trust scheme was supported by the authorities. *636 Section 1.6661-5(d), Income Tax Regs., defines "reasonable belief" as follows: (d) Reasonable belief. For purposes of section 6661, a taxpayer will be considered reasonably to believe that the tax treatment of an item is more likely than not the proper tax treatment if -- (1) The taxpayer analyzes the pertinent facts and authorities in the manner described in section 1.6661-3(b)(3) and, in reliance upon that analysis, reasonably concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld in litigation if the claimed treatment is challenged by the Internal Revenue Service; or (2) The taxpayer in good faith relies on the opinion of a professional tax advisor, if the opinion is based on the tax advisor's analysis of the pertinent facts and authorities in the manner described in section 1.6661-3(b)(3) and unambiguously states that the tax advisor concluded that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld in litigation if the claimed tax treatment is challenged by the Internal Revenue Service. [Sec. *637 1.6661-5(d)(1) and (2), Income Tax Regs.] Petitioners have not argued that reliance was placed upon the opinion of a professional tax advisor. Sec. 1.6661-5(d)(2), Income Tax Regs. Therefore, we must decide whether petitioners' conclusion, based upon the reliance on the pertinent facts and authorities, was reasonable. Sec. 1.6661-5(d)(1), Income Tax Regs. In light of the fact that petitioners' Dahlstrom trust scheme is indistinguishable from those that we invalidated in Zmuda and Professional Services, we find that it was unreasonable for petitioners to conclude that there would have been a greater than 50-percent likelihood that the tax treatment of the item would have been upheld in litigation if the claimed tax treatment were challenged by the Internal Revenue Service. Therefore, we sustain the addition to tax under section 6661 in the amount of $ 5,249.70. [9]
*638 Damages Under Section 6673
Respondent has requested that damages be awarded under section 6673. Section 6673provides: Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay, that the taxpayer's position in such proceeding is frivolous or groundless, * * * damages in an amount not in excess of $ 5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. [Sec. 6673.] Respondent informed petitioners by letter dated June 14, 1987, and by amendment to Answer, of the provisions of section 6673 and of this Court's prior decisions regarding the validity of similar Dahlstrom trust schemes. The Court likewise warned petitioners of the possibility of awarding damages. Despite the warnings of respondent and the Court, petitioners persisted in their claim. [10] Petitioners continued to maintain their position *639 herein with knowledge that our decisions in Zmuda and Professional Services clearly established that similar Dahlstrom trust organizations are "shams" and are not recognizable for Federal income tax purposes. It is apparent, therefore, that petitioners maintained this proceeding primarily for delay, [11] and proceeded upon frivolous claims consistently rejected by our prior decisions. Therefore, damages in the amount of $ 5,000 are awarded to the United States under section 6673. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable year 1982. ↩
2. By an amendment to his Answer the Commissioner increased the addition to tax under sec. 6661↩ to $ 5,249.70.
*. The amount will be computed on the full deficiency. ↩
3. The terms "trust," "foreign," "purchase," "sale," "note," "gift," "borrow," "loan," "royalty payment," "management service," "contract," and all related derivations are used herein merely for convenience in describing the form of purported transactions, and without intending any inference as to the tax characterization or consequences of any aspect of the transaction.↩
4. Ibabao Medical Corp. v. Commissioner,T.C. Memo. 1988-285; Ripley v. Commissioner,T.C. Memo. 1987-114; Estate of Yeoham v. Commissioner,T.C. Memo. 1986-431, affd. without published opinion 826 F.2d 11 (5th Cir. 1987); Akland v. Commissioner,T.C. Memo. 1983-249, affd. 767 F.2d 618↩ (9th Cir. 1985).
5. Petitioners contend that the real question in Professional Services↩ is whether the Court would have ruled against the taxpayers if the loan had been treated as a bona fide debt by them. We decline to opine on such an academic question of law where the facts are insufficient to permit us to dispose of such an issue.
6. Sampson v. Commissioner,T.C. Memo. 1986-231↩.
7. Drager v. Commissioner,T.C. Memo. 1987-483↩.
8. Antonides v. Commissioner,91 T.C. 686↩ (1988).
9. In 1982, sec. 6661 provided for an addition to tax equal to 10 percent of the underpayment of tax attributable to a substantial understatement of income tax. The amount was increased to 25 percent by sec. 8002(a) of Pub. L. 99-509, 100 Stat. 1951. This increased rate applies to all sec. 6661 additions to tax assessed after October 21, 1986. Pallottini v. Commissioner,90 T.C. 498 (1988). Respondent filed an amended Answer seeking an increase in the addition to tax under sec. 6661↩ to $ 5,249.70.
10. Petitioners' persistence may stem from the encouragement of Karl L. Dahlstrom, who assisted petitioners at trial. ↩
11. In Estate of Yeoham v. Commissioner, supra, a 1986 Memorandum Decision of this Court which involved a Dahlstrom trust scheme virtually indistinguishable from the present factual situation, we imposed section 6673↩ damages, as taxpayers had instituted and maintained their proceeding primarily for delay.