EARL W. DRAGER AND HAZEL I. DRAGER, ET AL., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; TENNILLE, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Drager v. Commissioner
Docket Nos. 3107-85; 3108-85.
United States Tax Court
T.C. Memo 1987-483; 1987 Tax Ct. Memo LEXIS 479; 54 T.C.M. (CCH) 650; T.C.M. (RIA) 87483; September 23, 1987. Joe Alfred Izen, Jr., for the petitioners. Sheri Wilcox, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these consolidated cases, the Commissioner determined deficiencies in Federal income tax and additions to tax as follows: Additions to Tax *
Taxable
Section
Section
Docket No.
Year Ended
Deficiency
6653(a)(1) [1]
6653(a)(2)
3107-85
12/31/80
$ 136,945.46
$ 6,847.27
N/A
12/31/81
201,674.07
10,083.70
-0-
12/31/82
92,580.00
4,629.00
**
3108-85
9/30/80
86,121.17
4,306.05
N/A
9/30/81
70,036.92
3,501.84
N/A
9/30/82
43,540.46
2,177.02
**
*481 Following concessions by the parties, the issues this Court must decide are (1) whether certain payments by petitioner Tennille, Incorporated are deductible as wages or are dividend distributions; (2) whether other payments by Tennille, Incorporated are business expenses deductible pursuant to section 162(a)(3) or are divided distributions; (3) whether petitioners Earl W. and Hazel I. Drager are entitled to depreciation deductions with respect to certain commercial rental properties; (4) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations; and (5) whether petitioners Earl W. and Hazel I. Drager are liable for an addition to tax for their 1982 taxable year pursuant to section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Earl W. and Hazel I. Drager (the "Dragers"), petitioners in docket No. 3107-85, are husband and wife who resided at LaMarque, Texas at the time their petition was filed. Tennille, Incorporated ("TI"), petitioner in docket No. 3108-85, is a corporation having its principal place of business at Texas City, Texas at the time its petition was filed. TI was *482 incorporated in 1957. TI's principal business activity is the fabrication of large-scale sheet metal products for industrial use. Earl Drager performed valuable services for the corporation and is substantially responsible for the economic success of the corporation during the years at issue. Earl and Hazel Drager, the president and office manager of TI, respectively, own 97 percent of its stock. The remaining stock is owned by William E. Glidden, a superintendent of TI and its most highly compensated officer during the years at issue. Earl Drager acquired the real property on which TI is located in December of 1979. County records reflect no subsequent transfer of the real property. After learning of the tax shelter programs promoted by Karl Dahlstrom and the American Law Association, the Dragers attended seminars conducted by Dahlstrom. [2] Several attorneys and C.P.A.s also attended these seminars. Petitioners paid Dahlstrom a fee of $ 10,000.00 to attend the seminars, in return for which Dahlstrom provided the necessary documents and instructions to assist the Dragers in establishing a series of foreign trusts designed to shelter the Dragers' property and income from Federal *483 taxes. The Dragers did not seek independent advice on the validity for Federal income tax purposes of the trust arrangements promoted by Dahlstrom. The Dragers entered the Dahlstrom trust scheme principally to avoid Federal income tax. With the aid of the documents and instructions received from Dahlstrom, the Dragers established three trusts in and under the law of the country of Belize on or about August 1, 1978 -- Ado Trust company ("Ado"), Bedo Company ("Bedo"), and Cado Trust Organization ("Cado"). [3] Each of the trusts was created by the execution of a Contract and Declaration of Trust. Trust Certificates evidencing units of the trust were issued by each of the trusts in the manner described below. The certificates give the holder rights only to income distributed at the sole discretion of the trustees of the respective trusts. No interest in their assets is conveyed by the trust certificates. The "Exchangor" of Ado is Earl Drager, who holds all of its 100 trust units. *484 The Dragers are the trustees of Ado. Earl Drager transferred $ 100.00 to Ado on August 2, 1978, after which Ado engaged in no further activity. Ado maintains no books and records or financial accounts and has no assets other than the $ 100.00 it received from Earl Drager. The Dragers and TI are the "Exchangors" of Bedo, and initially held 90 trust units and 100 trust units, respectively, of the 100 trust units issued by Bedo. On August 9, 1978 all 100 trust units were transferred to Cado. [4]Ado is the trustee of Bedo. The Dragers purported to transfer by gift certain real and personal property owned by them to Bedo. No consideration was received for the transfers. The real and personal property that was purportedly transferred in August of 1978 was the following: 1) One-half interest in a note in the principal amount of $ 114,343.75, representing the contract price for the sale of land by the Dragers and E. C. Porterfield to one Ennis M. Cooley. 2) A note and Deed of *485 Trust in the principal amount of $ 80,000.00 for the sale of land by the Dragers. 3) Lease agreement covering property owned by Earl Drager and leased to State Sign Services. 4) Lease agreement covering property owned by Earl Drager and leased to United Parcel Service, Inc.
5) Lease agreement covering property owned by Earl Drager and leased to Pay Less Self Service Shoe Stores. 6) A citrus orchard in Cameron County, Texas. 7) Various parcels of real property including those covered by the leases identified above, owned by Earl Drager. TI purported to transfer to and lease back from Bedo certain plant equipment and real property. No documents exist evidencing transfer of title to Bedo of the plant equipment owned by TI. The plant equipment remained on the premises of TI. The Minutes of Bedo identify a list of the plant equipment and TI's premises as the properties purportedly transferred to the trust by TI. During its taxable years ended September 30, 1980, 1981, and 1982, TI deducted "rent payments" for the equipment purportedly transferred to and leased back from Bedo as follows: Taxable
Deductions for
Year
"Rent" Reported
1980
$ 91,000.00
1981
77,000.00
1982
[5] 36,400.00 *486 TI also deducted "rent payments" for the real property purportedly transferred to and leased back from Bedo as follows: Taxable
Deductions for
Year
"Rent" Reported
1980
$ 12,000.00
1981
16,500.00
1982
54,000.00
In addition, TI deducted payments to Bedo which it reported as fees for "sub-contracts" and "consultants" in the amounts of $ 120,000.00, $ 90,000.00, and $ 30,000.00 for its 1980, 1981, and 1982 taxable years, respectively. Bedo received payments attributable to the notes and leases purportedly transferred to the trust by the Dragers in the following amounts: $ 61,392.44 in calendar year 1980; [6] $ 58,092.44 in calendar year 1981; [7] and, $ 34,645.59 for the period January 1, 1982 to July 31, 1982. Respondent, in determining that this rent income was taxable to the Dragers, allowed the Dragers to deduct expenses attributable to the leased properties in the amounts of $ 10,306.26, $ 5,060.73, and $ 2,543.75 for the Dragers' 1980, 1981, and 1982 taxable years, respectively. [8] *487 Respondent did not allow any deduction for depreciation. Bedo received payments from the sale of fruit from a citrus orchard, purportedly transferred to the trust by the Dragers, in the amounts of $ 13,151.65, $ 1,841.15, and $ 17,958.20 during the calendar years 1980, 1981, and 1982, respectively. Respondent determined that these payments were income to the Dragers for their 1980, 1981, and 1982 taxable years, and allowed the Dragers to deduct expenses attributable to the citrus orchard in the amounts of $ 3,852.32, $ 5,245.18, and $ 3,309.99 for their 1980, 1981, and 1982 taxable years, respectively. None of *488 these amounts of income or expense determined by respondent were reported in the Dragers' 1980, 1981, and 1982 Federal income tax returns filed with respondent. Bedo also received interest income from notes and certificates of deposit held in its name, and from other sources, in the amounts of $ 7,455.29, $ 31 531.16, and $ 25,107.10 during the calendar years 1980, 1981, and 1982, respectively. [9] In addition, Bedo received $ 2,000.00 from the sale by Earl Drager of a pipeline right-of-way through unimproved property he owned. The Dragers had signatory authority over a checking account maintained in Bedo's name at the Mainland Bank of Texas City, Texas. The balance in Bedo's account as of July 30, 1980 was $ 70,000.00. During the years at issue, the following major transactions took place in the Bedo account: Amount of Deposit/
Transferor/
Date
(Withdrawal)
(Transferee)
2/20/80 *
($  31,440.00)
(Hazel Drager)
7/30/80
145,000.00 Hazel Drager 7/30/80
(  215,000.00)
(Cado)
7/31/80
145,000.00 Cado 7/31/80
(  145,000.00)
(Hazel Drager)
1/08/81
(   55,000.00)
(Cado)
1/08/81
125,000.00 Cado 6/19/81 *
(   10,500.00)
(Hazel Drager)
*489 The "Exchangor," sole trustee and sole beneficiary of Cado was Ado. Cado maintained a checking account at the Mainland Bank of Texas City, Texas. Hazel Drager has signatory authority over the account. During the years at issue the following deposits to and withdrawals from Cado's account were made: [10]
Amount of Deposit/
Transferor/
Date
(Withdrawal)
(Transferee)
5/27/80
($      90.00)
(Hazel Drager)
7/30/80
215,000.00 Bedo 7/31/81
(  145,000.00)
(Bedo)
1/08/81
55,000.00
Bedo 1/08/81
(  125,000.00)
(Bedo)
2/26/81 *
(   20,000.00)
(Hazel Drager)
The Dragers maintained a personal checking account at the Mainland Bank of Texas City, Texas. The balance *490 in this account was $ 53,623.46 as of July 29, 1980. On July 30, 1980 the Dragers borrowed $ 95,000.00 from the Mainland Bank and Deposited this amount into their account. That same day, Hazel Drager drafted a check from the Dragers' account to Bedo in the amount of $ 145,000.00. On July 31, 1980 Hazel Drager deposited into the Dragers' personal account a check from Bedo in the amount of $ 145,000.00, which she herself drafted. Also on July 31, 1980, Hazel Drager drafted a check on the Drager's personal account payable to the Mainland Bank in the amount of $ 95,000.00 in repayment of the loan from the bank. Earl Drager applied for and began receiving Social Security benefits in 1979. The Dragers were aware that the receipt of wages by Earl Drager could reduce his eligibility for social Security benefits. Consequently, TI and Bedo reported that no wages were paid to Earl Drager during his 1979 through 1982 taxable years. The Dragers filed a Form 1040NR, United States Nonresident Alien Income Tax Return, in the name of Bedo Company for each of Bedo's 1980, 1981, and 1982 taxable years. On its Form 1040NR, Bedo reported adjusted gross income of $ 218,933.70 and a deduction *491 designated as a "Contingent Royalty to Cado" in the amount of $ 215,000.00. Respondent notified the return preparer who prepared Bedo's 1980 and 1981 returns that the trust arrangement was invalid for Federal tax purposes. The return preparer conveyed this information to the Dragers and refused to prepare Bedo's 1982 return. Notwithstanding the return preparer's advice, the Dragers filed a Form 1040NR for Bedo's 1982 taxable year reporting the trust transactions in accordance with the Dahlstrom scheme. Hazel Drager was aware in 1982 or 1983 that this Court, in Zmuda v. Commissioner,79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984), had declared the trust scheme promoted by Dahlstrom to be invalid for Federal tax purposes. At the time of trial the Dragers continued to utilize the trust arrangements established through Dahlstrom in preparing their Federal income tax returns. The Dragers filed joint Federal income tax returns for their 1980, 1981, and 1982 taxable years. The Dragers did not provide their return preparer, a different preparer than the individual who prepared Bedo's returns, with any records of the trusts. Respondent disregarded *492 the existence of Ado, Bedo, and Cado for Federal tax purposes, and treated the Dragers and TI as the true parties to the transactions in which the trusts purportedly participated. Respondent treated payments to the trusts as income to the Dragers, and allowed certain expenses incurred by the trusts to be deducted by the Dragers. Respondent disallowed TI's claimed deductions for its payments to Bedo designated as fees for "consultants" and "sub-contracts." Respondent also disallowed TI's claimed deductions for rent on the purported gift-leaseback of equipment and real property to Bedo. Respondent determined that all of these disallowed deductions were dividends from TI to the Dragers. OPINION At the trial of this case petitioners conceded that the trusts established by the Dragers were without substance and were to be disregarded for Federal income tax purposes. This Court must decide whether (1) TI may deduct payments for "consultants" or "sub-contracts" as compensation for services; (2) the Dragers may deduct depreciation on rental property owned by them that was purportedly transferred to Bedo; (3) TI may deduct payments of rent to Bedo for the gift-leaseback of equipment *493 and real property; (4) whether petitioners are liable for additions to tax for negligence; and (5) whether the Dragers are liable for an addition to tax pursuant to section 6661. Petitioners argue that TI's payments to Bedo characterized as fees for "consultants" and "sub-contracts" were intended to compensate Earl Drager for services performed for TI, and as such are deductible pursuant to section 162(a)(1). Respondent concedes that TI received services (from Earl Drager, not from Bedo) and that the payments to Bedo were for the services rendered. Respondent contends, however, that TI did not intend to pay and Earl Drager did not intend to receive compensation for Earl Drager's services. Further, respondent argues that TI, which had substantial earnings and profits, [11] had not paid any dividends, and therefore, TI's payments were dividend payments which the corporation is not entitled to deduct. A payment to a shareholder/employee *494 is compensation if each of the following is satisfied: (a) the corporation must intend the payment to be solely for services rendered by the shareholder/employee, and (b) the amount paid must be reasonable with respect to the services rendered. Section 1.162-7, Income Tax Regs.; Electric and Neon, Inc. v. Commissioner,56 T.C. 1324 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). The intent of the corporation to pay compensation for services is a condition precedent to allowing the deductibility of such payments, Electric and Neon, Inc. v. Commissioner, supra, and is determined by its treatment of the payment at issue at the time the payment was made. Paula Construction Co. v. Commissioner,58 T.C. 1055, (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). A corporation may not alter its treatment of such payments though it operated under a mistake of fact or law which, if known, would have motivated the corporation to characterize its payments differently. 58 T.C. at 1060. TI characterized its payments to Bedo as fees *495 for services made pursuant to a "consulting" contract between Bedo and TI. [12] The services were performed exclusively by Earl Drager for TI. In the years preceding the years at issue, Earl Drager worked long hours as a principal officer of TI. His work responsibilities for TI did not change during the years 1980 through 1982, other than to increase as the success of TI's business improved. Though TI reported that only 50 percent of Earl Drager's time was spent working for the company in 1980, 1981, and 1982, while the balance was spent working purportedly for Bedo, in effect Earl Drager worked exclusively for TI. We believe TI's payments to Bedo which it has labeled fees for "consultants" and "sub-contracts" were compensation and not dividends. [13] The payments were in return for Earl Drager's services to the corporation, have consistently been characterized as such, and TI always intended the payments to secure Earl Drager's services. In disregarding Bedo's existence for Federal income tax purposes, we treat these payments as being received directly by Earl Drager. Disregarding Bedo, however, does not change the evidence revealing *496 TI's intentions. Respondent makes too much of the fact that TI issued no Form W-2 to Earl Drager and reported that no wages were paid to Earl Drager during the years at issue. TI reported the wages as paid, albeit to Bedo, but such payments to Bedo were intended exclusively to be compensation for the services of Earl Drager. Compare Paula Construction Co. v. Commissioner, supra.Earl Drager performed valuable services for the corporation and is largely responsible for the substantial success of the corporation during 1980, 1981, and 1982. Accordingly, TI is entitled to deduct as compensation paid to Earl Drager its payments labeled fees for "consultants" and "sub-contracts," for its taxable years 1980, 1981, and 1982, in the amounts as set forth in our Findings of Fact. Respondent argues, however, that Earl Drager did not intend to receive wages, since he had applied for Social Security benefits *497 which he risked losing if he received compensation. Respondent notes that Earl Drager testified that he did not intend to receive wages so that he could preserve his eligibility for Social Security benefits. Further, TI reported on its Federal corporate income tax returns that it paid no wages to Earl Drager during its 1980, 1981, and 1982 taxable years. However, the focus of our inquiry is on the intent of the payor-corporation. See Paula Construction Co. v. Commissioner, supra;Electric and Neon, Inc. v. Commissioner, supra. In this case, unlike the corporation pay or in Paula Construction Co., TI never characterized its payments as dividends and consistently treated its payments to Bedo as payments solely for Earl Drager's services. Respondent argues further that Earl Drager refused wages in order to build up the capital of TI. While in other circumstances a closely-held corporation may intend not to pay wages to its officers if the officer-shareholders have agreed to accept reduced compensation to develop the capital of the corporation, [14] in this case the capital of TI was securely established. Moreover, because payment of a dividend *498 reduces capital to the same extent as payment of compensation, we do not believe Earl Drager's attempt to divert his wages to Bedo was premised on any desire to enhance the capital position of TI. The payments were made and to that extent TI's capital was impaired. We are simply giving effect to the conclusion we reached earlier, i.e., that Bedo must be ignored. We next decide whether TI's payments to Bedo as rent for the equipment and real property purportedly transferred to the trust are properly deductible pursuant to section 162(a)(3). Respondent argues that no property transfer took place, and that therefore TI's "rent" payments to Bedo are in substance disguised dividends to the Dragers which are not deductible by the corporation. We agree. In general, payments of rent for the use or possession of property used in the taxpayer's trade *499 or business are deductible if the taxpayer has not taken or is not taking title to the property, or if the taxpayer has no equity in the property. Section 162(a)(3). In May v. Commissioner,76 T.C. 7, 13 (1981), affd. 723 F.2d 1434 (9th Cir. 1984), this Court adopted a four-part test, each element of which must be satisfied, to determine whether payment of rent to a trust to which property has been transferred is deductible by the taxpayer: (1) The grantor must not retain substantially the same control over the property that he had before he made the gift. (2) The leaseback should normally be in writing and must require payment of reasonable rent. (3) The leaseback (as distinguished from the gift) must have a bona fide business purpose. (4) The grantor must not possess a disqualifying "equity" in the property within the meaning of section 162(a)(3). [Footnote ref. omitted.]
May v. Commissioner,76 T.C. at 13; see Rosenfeld v. Commissioner,706 F.2d 1277 (2d Cir. 1983). The trustee of the trust must be independent of the grantor of the property to the trust. Van Zandt v. Commissioner,341 F.2d 440 (5th Cir. 1965), *500 cert. denied 382 U.S. 814 (1965); May v. Commissioner, supra.
The Fifth Circuit has held that a taxpayer must establish a business purpose for the transfer-leaseback transaction viewed as a whole. Matthews v. Commissioner,520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); Van Zandt v. Commissioner, supra.In May v. Commissioner,76 T.C. at 13, note 3, we declined to adopt the position that a transfer-leaseback is in substance a single transaction for which a taxpayer must establish a business purpose for the transaction as a whole. Instead, we treated each element of the transaction independently. See also Rosenfeld v. Commissioner,706 F.2d 1277, 1280 (2d Cir. 1983). Under either the May or Matthews tests, TI's transfer-leaseback fails. Petitioners have failed to establish that the transfer and leaseback between TI and Bedo was a valid transaction for Federal tax purposes. No documents of title to the equipment or the real property were transferred.[15] The equipment remained in the possession of TI and was used by TI in its business. *501 The record reflects that TI retained essentially the same control over the equipment and real property after the purported transfer as it had prior to the purported transfer. Further, the grantor of the property is not independent of the trustee of the trust, as the Dragers effectively control both TI and Bedo. The transfer-leaseback fails to satisfy the tests articulated in May v. Commissioner, supra.TI parted with nothing. In addition, petitioners have failed to establish a bona fide business purpose for the purported transfer-leaseback. Matthews v. Commissioner, supra.The form of the transaction was a device to distribute earnings and profits to the Dragers and therefore, we disregard the form of the transaction for Federal income tax purposes. TI's equipment and real property "rent" payments to Bedo, in the amounts as set forth in our Findings of Fact, were in substance dividend payments to the Dragers which are not deductible by TI. Petitioners *502 claim depreciation on commercial rental property that they purportedly transferred to Bedo subject to leases to independent third parties. Although he allowed the Dragers deductions for expenses incurred in leasing the properties, respondent contends that petitioners are not entitled to depreciation deductions because they have failed to establish their basis in the property. The record is indeed barren of evidence of any basis the Dragers had in this rental property. We are thus unable to determine allowable depreciation pursuant to section 167, and petitioners' claim to depreciation fails for lack of evidence. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933); see Halle v. Commissioner,7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949), cert. denied 338 U.S. 949 (1950). Respondent has determined additions to tax for negligence pursuant to section 6653(a) for petitioners' 1980, 1981, and 1982 taxable years. The principal reason the Dragers engaged in the Dahlstrom trust scheme was to avoid Federal income tax. The Dragers did not disclose all relevant information *503 to their return preparer and withheld trust records from their preparer. The Dragers employed different return preparers for their personal returns and for the trust returns, and engaged in circuitous transactions between the trusts designed to conceal income earned by them. The Dragers were aware of their obligation to pay tax, having filed Federal income tax returns in years prior to those at issue, disclosing all relevant information and paying the Federal income tax determined to be due. After the trust return preparer refused to prepare Bedo's 1982 return and informed the Dragers that respondent had determined the trust scheme was invalid for Federal income tax purposes, the Dragers themselves filed Bedo's 1982 return with respondent without the assistance of a return preparer. We are compelled to conclude that the Dragers acted both negligently and with intentional disregard of rules and regulations within the meaning of section 6653(a). The entire amount of their underpayment for their 1982 taxable year is due to negligence or intentional disregard of rules and regulations for purposes of section 6653(a)(2). We believe the additions to TI's taxes pursuant to section 6653(a) *504 were also proper. The Dragers owned 97 percent of the stock of TI, and were its principal officers. The Dragers, as officers of TI, were aware of TI's obligation to report its income and expenses and of the invalidity of Dahlstrom's trust scheme for Federal tax purposes. Accordingly, respondent properly determined additions to tax for negligence pursuant to section 6653(a)(1) for TI's 1980, 1981, and 1982 taxable years. The entire amount of TI's underpayment of tax for 1982 was due to negligence or intentional disregard of rules and regulations for purposes of section 6653(a)(2).
Section 6661 is applicable to returns the due date for filing of which, without regard to extensions, is after December 31, 1982. This section imposes an addition to tax if there is a "substantial understatement of income tax". [16] A substantial understatement of income tax, for purposes of section 6661, is the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000.00. Section 6661(b)(1). *505 The Dragers reported tax due in 1982 of $ 43,797.00. We are satisfied that the Dragers understated the tax required to be shown on their 1982 return by an amount well in excess of the greater of $ 5,000.00 or 10 percent of the tax required to be shown on the return. Further, petitioners have failed to establish that they are entitled to any of the relief provisions provided by section 6661(b)(2)(B) or section 6661(b)(3). The Dahlstrom trust scheme is a "tax shelter" within the meaning of section 6661(b)(2)(C). United States v. Dahlstrom,713 F.2d 1423 (9th Cir. 1983), cert. denied 466 U.S. 980 (1984). [17] Therefore, the relief provided by section 6661(b)(2)(B) will be available only if (1) the Dragers' tax treatment of the trust items of income and expense was supported by "substantial authority," see section 1.6661-3, Income Tax Regs., and (2) the Dragers reasonably believed that such treatment "was more likely than not the proper treatment." Section 6661(b)(2)(C)(i)(II). *506 The Dragers admit they sought no independent counsel as to the validity of the Dahlstrom trust scheme for Federal tax purposes. See section 1.6661-5(d)(2), Income Tax Regs. The Dragers' return preparer properly refused to prepare their 1982 return reflecting the specious Dahlstrom scheme. Petitioners have, in addition, pointed to no authority whatsoever on which they relied to establish that their treatment of the trust items was correct, as of the date their 1982 return was filed. Section 1.6661-3, Income Tax Regs. Comments by accountants attending the Dahlstrom seminars are not authority. Moreover, Hazel Drager herself testified that she was skeptical of the validity of the Dahlstrom trust scheme for Federal tax purposes. Accordingly, we conclude that respondent properly imposed the addition to tax pursuant to section 6661 for the Dragers' 1982 taxable year. To reflect the foregoing, Decision will be entered pursuant to Rule 155.
Footnotes
*. The Commissioner also determined petitioners in docket No. 3107-85 are liable for an addition to tax for their 1982 taxable year pursuant to section 6661↩ in the amount of $ 9,258.00. 1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
**. These amounts, representing 50 percent of the interest on that portion of the underpayment attributable to negligence or intentional disregard of rules or regulations, cannot be determined until assessment. ↩
2. Hereinafter, a reference to Karl Dahlstrom includes a reference to the American Law Association. ↩
3. In addition, the Dragers established a fourth trust, Daco Trust, on February 21, 1981. ↩
4. Cado paid the Dragers $ 90.00 for the trust certificates, which the Dragers characterized as "useless." The record contains no other information on the transfer of TI's certificates to Cado. ↩
5. TI's books and records reflect that it paid $ 43,400.00 in rent during its 1982 taxable year. However, TI reported as a deduction only $ 36,400.00. ↩
6. Respondent determined an adjustment to income of $ 61,384.44 in his notice of deficiency. This figure is based on a computational error -- the correct figure is $ 61,392.44. ↩
7. The Dragers reported rent income of $ 10,500.00 for their 1981 taxable year. Accordingly, respondent determined an adjustment to rent income of $ 47,592.44 for the Dragers' 1981 taxable year. ↩
8. Respondent determined a negative adjustment to rent income of $ 5,062.73 for the Dragers' 1981 taxable year. This figure is based on a computational error -- the correct amount is $ 5,060.73. ↩
9. Respondent determined an adjustment to interest income of $ 24,966.61 for the Dragers' 1982 taxable year. This amount is based on a computational error -- the correct figure is $ 25,107.10. ↩
*. The Dragers failed to identify these payments in their responses to respondent's interrogatories. The apparent source of these funds is from Treasury bills held in Bedo's name. ↩
10. Cado's checking account balance was $ 17.02 as of July 29, 1980. ↩
*. The Dragers failed to identify the payment, which they identify as a "loan" from Cado, on their responses to respondent's interrogatories. The record does not indicate the source of these funds. ↩
11. The parties stipulated what respondent had determined as TI's earnings and profits. Petitioner offered no proof of TI's earnings and profits. ↩
12. The contract is not in the record. ↩
13. Whether the payments are wages or dividends are immaterial to the Dragers for Federal tax purposes, since their receipt in both cases results in income to them. The dividend deduction has been fully applied against other dividends received by the Dragers. ↩
14. See Russos v. Commissioner,T.C. Memo. 1977-309; Shiocton Lumber Co. v. Commissioner,T.C. Memo. 1974-132; Joseph P. Kropf, Inc. v. United States,543 F. Supp. 581↩ (D. Colo. 1982). 15. A purported lease document between TI and Bedo states the term of the lease and rent due, but fails to identify the equipment or real property purportedly transferred and leased back. ↩
16. As of the date of the notice of deficiency in which respondent determined the section 6661(a) addition to tax against petitioners, the section 6661(a) addition to tax was equal to 10 percent of the underpayment attributable to a substantial understatement. Section 6661(a) has twice been amended since then. The Tax Reform Act of 1986, Pub. L. 99-514, section 1504(a), 100 Stat. 2085, 1743, increased the section 6661(a) addition to tax to 20 percent of the underpayment attributable to a substantial understatement for returns the due date of which, determined without regard to extensions, is after December 31, 1986. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, section 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. No issue has been raised in this proceeding as to which Act controls and we express no opinion at this time as to the effect of either of the above-referenced Acts on section 6661(a). We merely sustain respondent's determination of section 6661(a)↩ additions to tax in the amount asserted. 17. See also Ripley v. Commissioner,T.C. Memo. 1987-114↩.