KARL L. DAHLSTROM AND CLARA J. DAHLSTROM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dahlstrom v. Commissioner
Docket No. 19904-83
United States Tax Court
T.C. Memo 1991-264; 1991 Tax Ct. Memo LEXIS 302; 61 T.C.M. (CCH) 2863; T.C.M. (RIA) 91264; June 11, 1991, Filed Dahlstrom v. Commissioner, 85 T.C. 812, 1985 U.S. Tax Ct. LEXIS 17 (1985)
*302 Decision will be entered under Rule 155. Karl L. Dahlstrom, pro se. David W. Johnson and Sheri Wilcox, for the respondent. SCOTT, JUDGE. PAJAK, Special Trial Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge John J. Pajak pursuant to the provisions of section 7443A(b) and Rule 180 et seq. (All section numbers refer to the Internal Revenue Code for the taxable years in issue. All Rule numbers refer to the Tax Court Rules of Practice and Procedure.) The Court agrees with and adopts his opinion, which is set forth below.
OPINION OF THE SPECIAL TRIAL JUDGE Respondent determined deficiencies in petitioners' Federal income taxes, and additions to tax only as to petitioner Karl L. Dahlstrom, as follows: Additions to Tax
Year
Deficiency
under Section 6653(b)
1977
$ 155,733.00
$  77,866.50
1978
341,689.00
170,844.50
1979
788,152.00
394,076.00
This Court must decide: (1) Whether the statute of limitations bars respondent from assessing and collecting taxes for the year 1977 and 1978; (2) whether petitioners used sham trust organizations to understate their taxable income or, alternatively, whether *303 petitioners are taxable under the grantor trust provisions of sections 671 through 677; (3) whether petitioners are entitled to deductions for losses from the sale of trust certificates in 1977; and (4) whether petitioner Karl L. Dahlstrom is liable for additions to tax for fraud. FINDINGS OF FACT Petitioners resided in College Station, Texas, when their petition was filed. Petitioners filed joint income tax returns for the years in issue. The use of the terms "trust," "organization," "create," "royalty payment," "consulting service," "contract," "sale," "purchase," "gift," "tax package," and other similar terms and derivations is not intended to accord any legal significance to such terms. These terms are used solely for convenience in describing petitioners' purported transactions. Background
Petitioners refused to comply with respondent's informal discovery requests. The facts and exhibit set forth in respondent's request for admissions, served on petitioners on June 8, 1984, and filed with the Court on June 11, 1984, were deemed admitted on July 9, 1984, pursuant to Rule 90(c). By the Court's order on November 19, 1985, petitioners' motion to withdraw admissions, *304 filed September 12, 1984, was denied except that it was granted as to the conclusory admission that "There are due from petitioners the deficiencies in income tax and additions to tax as determined by respondent." Dahlstrom v. Commissioner, 85 T.C. 812 (1985) (Dahlstrom I). By the Court's order of May 24, 1988, the facts and evidence in respondent's proposed stipulation of facts of March 21, 1988, were deemed to be established because petitioners' response to this Court's Rule 91(f) order to show cause was evasive and not fairly directed to the proposed stipulation of facts. At the hearing, because petitioners did not object to the truth of facts set forth in respondent's proposed First Supplemental Stipulation of Facts, filed December 12, 1988, we orally ordered that these facts and evidence contained therein were deemed established. Rule 91(f). Pursuant to section 6861, on September 23, 1987, respondent made jeopardy assessments of deficiencies in income tax due from petitioners, additions to tax due from petitioner Karl L. Dahlstrom, and interest in the following amounts: Additions to Tax
Taxable
Under
Year
Deficiency
Section 6653(b)
Interest
Total
1977
$ 124,339
$  62,170
$ 197,513
$   384,022
1978
237,848
118,924
353,694
710,466
1979
470,659
235,330
642,373
1,348,362
Sham Trusts
During 1977 through 1979, petitioner Karl L. Dahlstrom (petitioner) *305 promoted and sold a tax shelter program (program) he had devised. Petitioner has a master's degree in education and physics, but no formal training or education in law or taxation. Sales of the program took the form of sales in memberships in an association called the American Law Association (ALA) which petitioner had formed. See the description in United States v. Dahlstrom, 713 F.2d 1423, 1425 (9th Cir. 1983). The constitution of ALA provided in part that "The Association is formed under common law and forms no legal entity distinct from that of its members."
Petitioner was the president of ALA during 1977 through 1979. For a fee of $ 6,000 to $ 12,000, members joined ALA and attended seminars given by petitioner. Petitioner conducted numerous seminars during the years in issue and instructed participants on the use of the program to set up their own tax avoidance trust schemes. At the seminars, petitioner distributed a package of tax shelter program materials (package) to the participants. The package of materials included preprinted forms, organizational minutes and *306 certificates for establishing trusts, numerous excerpts from cases, legal commentary and newspaper articles, and other materials on the development, structure, and use of trusts. The materials also included information referred to as the "Taxpayers Legal Defense." During the years in issue, petitioner used trust organizations/trusts like those promoted in his seminars to conduct petitioners' personal and investment activities. Fees paid by ALA members to attend the seminars and to receive the package of materials were deposited into bank accounts under the name of Trust Publications over which only petitioners had signatory authority. The Trust Publications bank accounts were at the Citizens State Bank (Citizens), Bryan, Texas; the First Bank of Snook (Snook), Snook, Texas; and the University National Bank (Univ.), Bryan, Texas. No employer identification number or Social Security number was given for any of these accounts. During the years 1977, 1978, and 1979, these fees totaled $ 244,372.10, $ 483,757.62, and $ 938,221.39, respectively, for a 3-year total of $ 1,666,351.11. These amounts do not include transfers or any nontaxable or excludable income. Petitioners did not *307 include on their joint returns for 1977, 1978, and 1979 any of these amounts except $ 22,005.45, $ 14,938 and $ 22,300 in trustee's fees for each respective year. On the 1977, 1978, and 1979 returns, petitioner reported his occupation as "Consultant," "Educational Consultant," and "Consultant," respectively, and his spouse's occupation was reported as "Housewife" on all three returns. The 1977, 1978, and 1979 returns were filed on or about April 17, 1978, April 16, 1979, and April 15, 1980, respectively. For the year 1977, petitioners reported the following sources and amounts of gross income: Schedule C:
Rockwood Water District
$  8,630
Schedule D:
30 units - Clear Gold Org.
10
Form 4797:
60 units - Clear Gold Org.
20
Schedule E:
Royalty Income
100
Other Income:
Trustee Fee, Debt Forgiven
33,875
Total
$ 42,635
For the year 1978, petitioners reported the following sources and amounts of gross income: Interest
$      5
Trustee Fee (Trust Publications)
14,938
Total
$ 14,943
For the year 1979, petitioners reported the following source and amount of gross income: Trustee Fee (Trust Publications)
$ 22,300
A large part of the monies *308 from seminar fees deposited into the Trust Publications accounts was then funneled through a series of bank accounts in the names of other trusts, controlled directly or indirectly by petitioners, before being disbursed by petitioners for petitioners' benefit. Petitioner filed Forms 1041 (U.S. Fiduciary Income Tax Return) in the name Trust Publications for the taxable years in issue. The deemed admissions established that these Forms 1041 were filed on a fiscal year basis, and this was reflected in Dahlstrom I. The blanks in the Forms 1041 in the record were not filled in to show a fiscal year basis of reporting and were signed by petitioner on April 17, 1978, April 10, 1979, and April 15, 1979, for the years 1977, 1978, and 1979, respectively. At trial, petitioner testified that these returns were filed on a calendar year basis rather than a fiscal year basis, and respondent agreed. In view of this clarification, we revise our statement in Dahlstrom I that petitioner accurately and fully disclosed all fees from the sale of ALA memberships on the Trust Publications Forms 1041 because petitioner did not accurately and fully disclose all such fees on these Forms 1041, based on *309 a comparison, on an annual basis, of the amounts reported to the amounts deposited as follows: Gross Receipts
Gross Receipts per
Year
Form 1041
Bank Deposits
1977
$ 291,594.00
$ 244,372.10
1978
384,910.00
483,757.62
1979
[1] 954,821.00
938,221.39
Total
$ 1,631,325.00
[2] $ 1,666,351.11
On the Forms 1041, Trust Publications reported taxes due of "0," "0," and $ 21,866 for the years 1977, 1978, and 1979, respectively. Petitioner Clara J. Dahlstrom (Clara) executed a document entitled "Declaration of Trust of this Constitutional Trust" which purported to create "Trust Publications" (the name First Federal Trust had first been printed but then deleted) in Texas *310 on April 2, 1973. Trust Publications was a common law trust organization of the type promoted in petitioner's seminars, to which petitioners purportedly transferred ownership of tax shelter program materials consisting of books, records, indentures pertaining to pure trust organizations, and other property. Clara appointed petitioner trustee of Trust Publications. Petitioner then appointed Clara as a trustee of Trust Publications. Their powers as trustees of this trust were broadly defined as follows: Trustees' Powers shall be construed as general powers of citizens of the United States of America, to do anything any citizen may do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of this Trust.* * * Resolutions of the Board of Trustees authorizing a special thing to be done shall be evidence that such act is within its power.
The trust was for a duration determined solely by the trustees pursuant to the following terms: This Trust shall *311 continue for a period of twenty-five years from date, unless the Trustees shall unanimously determine upon an earlier date.* * * At the expiration of this Agreement, the then Trustees, if they so desire and believe that said Trust should not be closed, may renew this Agreement for a like or shorter period.
Petitioner owned all of the 100 trust certificates of Trust Publications. According to petitioner, a certificate owner is the only person with a contingent right to trust income, and the trustees decide whether this contingent right is to be exercised. Petitioners, as trustees and owners of Trust Publications, retained complete authority and control over all assets, including bank accounts, held in the name of Trust Publications. No one other than petitioners had signatory authority over the bank accounts. Trust Publications was the first tier in a multi-layered arrangement of trust organizations of the type promoted in petitioner's tax shelter program. All other trust organizations used by petitioners in their scheme contained similar or identical language concerning the trust structure and trustees' powers. [3]The trusts formed in the Turks and Caicos Islands (Grand *312 Turk) or in Belize referred to their laws instead of to those of the United States. Each trust had 100 trust certificate units. The trust certificates contained language similar or identical to the following: This certificate conveys no interest of any kind in the Trust assets, management or control thereof. The Contingent Rights hereby conveyed consist solely of income as distributed by the action and sole discretion of the Trustees. At the death of the holder hereof, this certificate is null and void.
On November 26, 1976, petitioner executed preprinted documents, which he had printed, to set up four nominally foreign trust organizations in the Turks and Caicos Islands. Petitioner named these trusts Reales' Trust Company (Reales), Grand Trust Company (Grand), International Clearing House (ICH), [4] and Val International (VAL). The preprinted documents were identical in *313 form for all four trust organizations. Petitioner paid Aubrey Smith (Smith), a tour guide and taxi owner in the Islands, $ 20 to sign his name as "creator" for each of the four trusts set up on November 26, 1976. Smith, as creator, is listed as the individual who appointed the first trustee of each of these trusts. The documents which purported to create Reales named petitioner as first trustee. The documents recite that petitioner on November 26, 1976, transferred $ 200 for $ 1 and 100 trust certificate units. The documents list Smith as "creator" and petitioner as transferor. On the same day as Reales was created, petitioner purportedly transferred the 100 units of Reales to Smith, who at best was a nominee for petitioner. Smith did not transfer *314 anything to the trusts and merely signed his name several times for $ 20 per trust at the request of petitioner, and had no further interest in the trusts. His participation in executing the trust documents appears to be without any real significance, except perhaps to comply with technical requirements of the laws of the Turks and Caicos Islands. Accordingly, actions ostensibly taken by Smith as "creator" of these trusts will be treated as if they were the actions of petitioner. The documents which purported to create Grand name petitioner as trustee. The documents recite that petitioner transferred $ 100 for $ 1 and 100 trust certificate units. The documents list Smith as "creator" and petitioner as "transferor." On October 24, 1977, petitioner made a gift of the Grand certificates to Val. Petitioner formed Reales and Grand for the purpose of exercising control as trustees over other trusts in his scheme. On October 22, 1977, and on December 7, 1977, petitioner, as trustee, appointed Clara as second trustee of Reales and Grand, respectively. On the same dates, petitioner and Clara appointed petitioner as executive trustee of Reales and Grand, respectively. There is no specific *315 authorization for the appointment of an executive trustee in either the Reales or the Grand trust instruments. The instruments provide for the appointment of a third trustee. On November 29, 1976, petitioner, in his capacity as trustee of Reales, executed the documents which purported to create VAL. The documents list Reales as first trustee and Smith as creator. The documents state that Reales transferred $ 100 for $ 1 and 100 trust certificates, and Reales is denoted as transferor of Val. On November 29, 1976, petitioner, in his capacity as a trustee of Trust Publications and as a trustee of Reales, which was the trustee of Val, executed the documents which purported to create ICH. The documents name VAL as the first trustee and Smith as the creator. The documents recite that on November 29, 1976, Trust Publications transferred $ 100 and "Copies of Documents, written opinions of others and other materials and papers concerning foreign trust organizations, taxation and treaties" for $ 1 and 100 trust certificate units. On that day, petitioner, as trustee for Reales, which was trustee for Val, certified that Trust Publications owned 100 units of ICH. On the same day, petitioner, *316 acting in the same capacity, certified that Val was the owner of 100 units of ICH. On December 22, 1976, petitioner, acting as a trustee for Trust Publications, transferred 100 trust certificate units of ICH to Val. The Declaration of Trust of ICH and the other trusts limits the number of trust certificate units to 100 units. Petitioner used another nominally foreign trust organization, Information Services International (ISI), which was purportedly formed in Belize on October 18, 1977. As with the other foreign trust organizations, petitioner used a straw person to sign the preprinted forms as "creator." Lacelle Tillet, the named creator of ISI, was a tour guide and taxi owner in Belize. Like Aubrey Smith, Tillet did not transfer anything to the trusts and merely signed his name several times. His participation in executing the trust documents appears to be without any real significance, except perhaps to comply with technical requirements of the laws of Belize. Accordingly, actions ostensibly taken by Tillet as "creator" of these trusts will be treated as if they were the actions of petitioner. Tillet appointed Reales the trustee of ISI on October 18, 1977, and petitioner, *317 as trustee for Reales, acknowledged this on November 1, 1977. The named transferor/exchanger was Glenn A. Huff, who sold ALA materials in Alaska. Huff purportedly transferred $ 100 and "Books, records, files and other forms of information, technical knowledge, and methods concerning domestic and foreign taxation, treaties, organizations and operation modes" for $ 1 and 100 trust certificate units. Huff was named the original trust certificate owner of ISI, but made a "gift" of the ISI trust certificates to Val within a month after the trust was formed. Huff was acting on behalf of petitioner. Initially, petitioner was the trustee and then both petitioners became the trustees of Reales and Grand. Reales was the named trustee of ISI and Val, and Val was the named trustee of ICH. Although he purported to transfer trust certificates to Smith, petitioner owned Reales. Reales held the trust certificates of Val, and Val held the trust certificates of Grand, ICH, and ISI. Petitioner, as trustee of Reales, had the sole signatory authority over the bank accounts of ICH and ISI. Petitioner, as Reales of Reales, as trustee of Grand, and as trustee of both Reales and Grand, had sole *318 signatory authority over some of the bank accounts of Val. Petitioner and Clara, and petitioner and Clara as trustees of Reales, had the sole signatory authority over the remaining bank accounts of Val. Petitioners owned and exercised control over all assets and accounts in the names of Reales, Grand, ICH, ISI, and Val. Trust Publications was the first tier in petitioners' distribution scheme. ICH and ISI comprised the second tier in petitioners' distribution scheme. Val occupied the third tier in petitioners' distribution scheme. The first three tiers were essentially sequential conduits for income earned by petitioner. As is discussed below, petitioner created additional trusts using straw persons, such as employees or associates, who named petitioner or one of his other trusts as trustee. A broad outline of petitioner's scheme for the distribution of funds and assets other than directly from Trust Publications is as follows: Membership Fees Earned by Petitioner Trust Publications ICH/ISI
Val
Other Trust Organizations
Used by Petitioners
On September 2, 1977, ICH purportedly sold "Tax Shelter Package A [which] contains copies of documents, copies of *319 other materials and papers that [ICH] has at its disposal" to Trust Publications and ALA for $ 100,000. This purported contract provides in part that: 4. Package A is to be used solely by Trust Publications and American Law Assoc. and will not be presented or disclosed to any other individual, organization or any other entity by Trust Publications or Am. Law Ass. nor will it be given to any entity by Trust Publications or American Law Association unless compensation is equal to that stated above or greater and [Blanks in the form were filled in as indicated by the underlining.]
On December 7, 1977, ISI purportedly sold "Tax Shelter Package B-9 [which] contains copies of documents, copies of written opinions of others and copies of other materials and papers that [ISI] has at its disposal" to Trust Publications and ALA for $ 150,000 per year for an unlimited period. This purported contract provides in part that: 4. Package B-9 is to be used solely by Trust Publications and American Law Association and will not be shown, explained, loaned, revealed, sold or in any way presented or disclosed to any other individual, organization or any other *320 entity by Trust Publications & Am. Law Assoc. nor will it be given to any entity by Trust Publications and American Law Association unless compensation is equal to that stated above or greater and [Blanks in the form were filled in as indicated by the underlining.]
On August 30, 1978, ISI purportedly sold "knowledge, skill and know-how concerning 'Trust Organizations' to" Trust Publications and ALA for $ 360,000 per year for an unlimited period. On the same date, ISI purportedly agreed to provide professional consulting services to Trust Publications and ALA for a fee of $ 900,000, payable $ 300,000 on or before December 31, 1979, and $ 600,000 on or before December 31, 1989. ISI was to appoint the consultants who would perform the services. On December 22, 1979, ISI purportedly agreed to provide Trust Publications and American Law Association "legal defense and research services" for $ 800,000, payable $ 200,000 on or before December 31, 1979, and $ 600,000 on or before December 31, 1980. ISI was to appoint the persons who would perform the services. There were no disbursements from ISI to any persons for any such services during 1978 or 1979. Petitioners took deductions *321 on the Forms 1041 for Trust Publications for royalty payments to ICH and ISI of $ 235,100, $ 338,000, and $ 580,000 for 1977, 1978, and 1979, respectively, totalling $ 1,153,100. The 1977 royalty deduction was $ 90,000 more than the amounts transferred to ICH and ISI. Petitioner transferred $ 1,063,100 from Trust Publications accounts to accounts of ICH and ISI, the second-tier trusts, as follows: Year
ICH
ISI
Total
1977
$ 100,000
$  45,100
$   145,100
1978
0
338,000
338,000
1979
0
580,000
580,000
Total
$ 100,000
$ 963,100
$ 1,063,100
On November 10, 1977, petitioner transferred $ 90,000 from ICH to Val Account #1. On December 22, 1977, petitioner transferred $ 90,000 from Val Account #1 to ISI. There were no deposits to the ICH account other than those from Trust Publications. There were no deposits to the ISI account other than from Trust Publications and Val #1. Petitioner transferred $ 1,153,000 from ICH and ISI accounts to eight bank accounts in the name of Val as follows: Account
1977
1978
1979
Total
#1
$ 90,000
$    90,000
#2
10,000
$ 135,000
145,000
#3
130,000
130,000
#4
60,000
60,000
#5
148,000
148,000
#6
$  80,000
80,000
#7
300,000
300,000
#8
200,000
200,000
Total
$ 1,153,000
*322 Petitioner transferred a net of $ 1,063,000 from ICH and ISI to Val, the third-tier trust, during the taxable years in issue, after taking into account the $ 90,000 transfer from ICH to Val Account #1 and then to ISI in November and December 1977. (Account #5 and Account #7 bear the same bank account numbers in 1978 and 1979, respectively.) There were no transfers from either the ICH or the ISI accounts other than to the Val accounts during the years in issue. There were no transfers to the Val accounts from other than ICH or ISI accounts during the years in issue. No employer identification or Social Security numbers were given for the ICH, ISI, and Val accounts. To continue this circuitous route by which petitioners converted personal income into purported foreign trust royalty payments, gratuitous transfers, and finally cash used by domestic trusts to pay petitioners' personal living expenses or purchase assets, petitioners created a fourth distributional tier in their scheme. Petitioners, as trustees of Grand, also exercised complete control over this level, which consisted of three domestic trusts formed in Texas. These were Yellow Rose Properties (Yellow Rose), formed *323 in November 1977, Lark Enterprises (Lark), formed in November 1977, and Southern Utilities Company (Southern), formed in August 1979. Petitioners used straw persons as creators to name Grand, of which petitioners were trustees, the trustee of each of these three trusts. Yellow Rose, Lark, and Southern had accounts at the University National Bank, College Station, Texas. No employer identification number or Social Security number was given for these accounts. Petitioner, purportedly as trustee, transferred $ 1,063,000 from the Val accounts as follows: $ 285,000 to the Yellow Rose account in 1978 and 1979; $ 278,000 to the Lark account in 1978 and 1979; $ 162,456 to purchase a 155.35-acre tract of land in the name of Southern in 1979; $ 137,544 to the Southern account in 1980; and $ 200,000 for a certificate of deposit for Val account #8 in 1980. (After a series of certificates of deposit and deposits, this $ 200,000 was deposited in the North Fork account described below.) Clara, as Notary Public, notarized some of these transfers. None of these transfers were achieved through independent arm's-length dealings, nor did they have any independent economic significance. These were *324 gratuitous transfers of funds by petitioner from Val to the other trust organizations. Petitioners, through Yellow Rose, Lark, and Southern, operated businesses, maintained bank accounts and deposits, held title to and disposed of property for their own direct benefit. Petitioners, with funds from these trust organizations' bank accounts, paid personal living expenses they incurred. Petitioners held all the trust certificates for these trusts, either directly or as certificate holders of trusts which held certificates of these trusts directly or indirectly. Yellow Rose, Lark, and Southern also acted as conduits to transfer assets and funds to yet another group of trust organizations, which included North Fork Land Company (North Fork), Sunbelt Water Systems (Sunbelt), Rockwood Water District (Rockwood), Clear Gold Organization (Clear Gold), and Real Properties. [5] Petitioners exercised complete control over all these trust organizations. Petitioners, through these trust organizations, operated businesses, maintained bank accounts and deposits, held title to and disposed of tangible property for their own direct benefit. Petitioner often would withdraw funds from a trust account *325 to purchase a certificate of deposit, which in turn was used to purchase an asset. We consider such transactions as payments from trust accounts. Petitioners, using funds from these trust organizations' bank accounts, paid personal expenses they incurred. Petitioners held all the trust certificates for these trusts, either directly or as holders of trusts which held these trusts' certificates, directly or indirectly. Because of petitioners' refusal to cooperate during the audit, respondent's auditing agent had to try to locate petitioners' trust bank accounts through third-party contacts and leads from tax returns and other information. Contacts were made with banks, and based on the information that could be obtained, vendors were contacted. For example, by tracing petitioner's 1980 Audi license plate number, the agent learned that the Audi had been *326 purchased in the name of North Fork, a trust previously unknown to the agent. A requisition of the tax returns of North Fork was made, and a boat was listed on the depreciation schedule. The agent then obtained from the Texas Department of Wildlife the title histories of boats purchased by petitioners' trusts. Petitioner instructed at least one bank manager not to comply with respondent's summons. On another occasion, the agent sought information concerning the materials purchased for the construction of 1026 Rose Circle, College Station, Texas, from the office manager of Varisco Lumber Company. Petitioner showed up and asked to speak to her outside the office, which he did. After the office manager returned, she turned over the requested records to the agent and advised the agent that petitioner had asked her not to provide the records to the agent. The agent found numerous checks were illegible as to the name of the payee on the front of the check and as to the endorsement on the back of the check. This was because many of the checks for the amounts of the various transfers were written with a "copy-not" type of pen, which is designed to produce illegible or invisible copies *327 and microfilms of the checks. Because this hindered much of respondent's analysis of the records of checks for payees, dates and amounts, respondent could not trace all of petitioners' transfers. Some of the checks were made payable to one payee but deposited in a different account, which made it difficult to trace the flow of funds. Respondent's agent examined other evidence, such as check registers, land records, and sales invoices to track the activities of petitioners' trusts. Petitioners used all of the above mentioned trusts to conduct their personal affairs and invest the income they generated and funneled through Trust Publications. This is shown by their dealings in property, purchases of boats and automobiles, and financing of their various homes. Homes
Petitioners owned property at 2001 Rockwood Drive, Bryan, Texas, where they resided from 1974 to 1977. On November 1, 1977, petitioners, from a grantor trust otherwise not relevant to this opinion, transferred 2001 Rockwood Drive and all furnishings, furniture, fixtures, and personal belongings at that address, bonds, cash, and a parcel of land at 1026 Rose Circle to Yellow Rose upon its formation. Petitioners *328 continued to reside at the Rockwood address and use the personal belongings at that residence. On April 12, 1978, Yellow Rose purchased 1009 Rose Circle, College Station, Texas, for $ 66,000 with a $ 1,000 downpayment. The amount of $ 65,000 was transferred from a Val account to a Yellow Rose account to pay the balance of the purchase price on that date. Petitioners resided at 1009 Rose Circle until the completion of a new house at 1026 Rose Circle. On August 5, 1981, Yellow Rose sold 1009 Rose Circle for $ 90,000, which was deposited into a Yellow Rose account. Yellow Rose sold the real property at 2001 Rockwood Drive on July 13, 1978, to Mr. and Mrs. Fred McBride. The McBrides paid only interest of $ 411.67 per month to Yellow Rose. Five payments were made in 1979. Yellow Rose repurchased the property on November 26, 1980. On April 2, 1982, petitioner's parents in the name of another trust purchased 2001 Rockwood Drive from Yellow Rose for $ 50,833.36. This amount was deposited into the Yellow Rose account. On February 4, 1983, petitioners individually transferred the property back to Yellow Rose. Petitioner's parents continued to reside at 2001 Rockwood Drive. In February *329 1978, a building permit was obtained on behalf of petitioner to construct his new residence at 1026 Rose Circle. Construction expenses were billed both to petitioner individually and to Yellow Rose. Petitioner transferred funds from Val to Yellow Rose, and paid these expenses with funds from the Yellow Rose account. These expenses totalled $ 91,682.57. Petitioner also paid $ 456.50 from the Real Properties account for such expenses. Petitioners used funds from the Trust Publications and Yellow Rose accounts which totalled $ 37,851.74 to finish, furnish, decorate, landscape, and maintain their new home. On February 9, 1978, petitioner, individually as owner, entered into a contract for the construction of a swimming pool at 1026 Rose Circle. Petitioner had this pool constructed and maintained at the new residence and paid for these expenses with $ 15,077.78 from the Yellow Rose account. In August 1979, petitioners paid insurance on the home with Yellow Rose funds, and in September 1979, petitioners paid moving expenses with Trust Publications funds. Petitioner transferred title of 1026 Rose Circle from Yellow Rose to Real Properties in October 1980. Petitioners began construction *330 of servants' quarters on the property in February 1981. Clara paid $ 8,099.08 for building materials used to construct the servants' quarters with funds from the Real Properties account. Petitioners have resided at 1026 Rose Circle since the residence was completed. In 1982, petitioners used $ 14,560 from Real Properties and Yellow Rose accounts to purchase a sunscreen for this residence at 1026 Rose Circle. In 1982, petitioners purchased and developed bay property with water access in the Holiday Harbors Subdivision, Matagorda County, where petitioners visited. Petitioners used $ 41,618.13 from the Yellow Rose and Lark accounts for the acquisition of and construction of a house, bulkhead, and boat ramp on the property. They paid at least $ 645 in related expenses. The telephone listing for the property was in petitioner's personal name. Boats, Cars, and Trailers
During the years in issue and through part of 1984, petitioners purchased and used five recreational vehicles (e.g., a 1977 Winnebago motor home) with funds from the Trust Publications and Lark accounts. Petitioners paid insurance on the vehicles from the same accounts. Petitioners purchased and used six *331 other vehicles during that period, using funds from the Trust Publications, Lark, North Fork, and Sunbelt accounts controlled by petitioners. Petitioners paid insurance and some of the fees on the vehicles with funds from the Lark or North Fork accounts. Petitioners paid $ 98,040.89 from trust organization accounts that they controlled to third parties for these purchases and expenses. Trust Publications sold a motor home to Lark in 1980 for $ 5,977.32 more than the $ 17,560.58 Trust Publications paid in 1978. Petitioners used the various trust organizations to hold title to all of these vehicles. During the taxable years in issue, petitioners did not hold title to any vehicle in their individual names. Petitioner has enjoyed fishing all his life. During the years in issue and through part of 1984, petitioners purchased numerous boats, boat motors, and trailers. Petitioners paid expenses relating to these assets with funds from the trust accounts. Petitioners paid $ 88,535.83 from the Lark, Yellow Rose, and North Fork accounts to third parties for these purchases and expenses. (Lark sold two boat motors to Yellow Rose for $ 6,700.) Petitioners exercised complete authority *332 and control over all of these assets. Petitioners employed the trusts to hold title to all of these assets. Petitioners did not hold title to these assets in their individual names. Business and Other Properties
On July 26, 1977, petitioners, through Trust Publications, purchased a parcel of land near College Station, Texas, for $ 15,000. In October 1977, a builder was hired to construct a building on that land for an ALA campus for $ 15,500. The construction was paid for with funds from Trust Publications bank accounts. Between November 1977 and May 1978, petitioner signed checks totaling $ 11,317.43, drawn on a Trust Publications account and used to pay for services in constructing the ALA campus, which consisted of several buildings. Lark was created for the purpose of completing the ALA campus. Trust Publications conveyed the parcel of land on which the ALA campus was located to Lark on November 1, 1977. The funds in the Lark account were used to complete the campus. On June 17, 1981, a check in the amount of $ 20,910.10, drawn from the Lark account, was used to purchase a cashier's check in the same amount payable to American Steel Building Company, Inc. Funds *333 of at least $ 113,113.15 from the Lark account were used to pay for materials and furnishings used in completing the ALA campus. These payments were made with funds transferred from Val to Lark. During the taxable years and through 1984, petitioners paid at least $ 393,732.61 for commercial property investments and related expenses. In 1979 and 1980, petitioner used Southern to acquire title to numerous water systems with $ 69,269.46 of the funds transferred from a Val account. Many of these water systems were held in the names of Southern or Sunbelt Utilities, Inc. On April 12, 1982, in a contract between Donald Sass and Southern, Sunbelt, and Sunbelt Utilities, Inc., petitioner sold 17 water systems for $ 98,000 and directed that payment be made only to Sunbelt. In December 1979, petitioners purchased a 155.35-acre tract for Southern with $ 162,456 with three cashier's checks purchased with a check drawn on a Val account. This land was transferred to North Fork on October 23, 1980. Petitioners, through Clear Gold, owned 75 percent of a partnership called Energy Farms. Energy Farms held title to property that was transferred to North Fork. Petitioners purchased many other *334 parcels of land for North Fork during the taxable years and through 1984. Petitioners used funds from the North Fork account (including the $ 200,000 from the Val certificate of deposit) for these purchases and other related expenses. Petitioners personally acquired title to a few parcels of land, but then transferred the properties to themselves as trustees of Rockwood. These properties were ultimately transferred to Clear Gold. Payments[6]
During 1977 and 1979, petitioner wrote checks from Trust Publications accounts, payable to cash, of at least $ 14,059.38 and $ 32,252.50, respectively. From 1978 through January 1985, petitioner or Clara wrote checks from Trust Publications, Southern, Yellow Rose, and Lark accounts, payable to petitioner, of at least $ 43,963.76. Between 1977 and 1980, petitioner wrote *335 checks from Trust Publications, Southern, and Lark accounts payable to petitioner's father for $ 4,791.17. In 1978, petitioner paid a traffic ticket with funds from a Trust Publications account, and in 1979, petitioners paid their passport fees with funds from a Trust Publications account. 1977 Loss Deductions
On November 1, 1977, 10 trust certificates of Clear Gold were issued to petitioner and 90 trust certificates of Clear Gold were issued to Rockwood. On the same day, petitioners, on behalf of Rockwood, purportedly sold the 90 trust certificates of Clear Gold to Val for $ 30. On the same day, petitioner "gifted" 10 trust certificates of Clear Gold to Val. On the same day, 100 trust certificates of Clear Gold were issued in Val's name by petitioner, as trustee for Grand, which was the trustee of Clear Gold. On their 1977 Federal income tax return, petitioners reported that they acquired 30 units and 60 units of trust certificates of Clear Gold on November 1, 1977, for $ 4,000 and $ 5,000, respectively, and on the same day, sold them for $ 10 and $ 20, respectively. Petitioners deducted a short term loss of $ 3,990 (limited to $ 2,000) and an ordinary loss of $ 4,980 *336 arising from these transactions on their 1977 return. Respondent disallowed these loss deductions. Unreported Income Determinations
In the notice of deficiency dated April 15, 1983, respondent determined that petitioners had unreported income in the amount of $ 308,087, $ 693,577 and $ 1,584,691 for 1977, 1978 and 1979, respectively. On brief, respondent concedes the excess of the amounts determined in the notice of deficiency, over the taxable deposits into accounts styled in the names of trust organizations controlled by petitioners and income derived therefrom. Respondent's present position is that petitioners' unreported income is $ 223,154.65, $ 479,678.41, and $ 928,529.77 for 1977, 1978, and 1979, respectively, computed as follows: Year:     1977
Account Name and Bank
Type of Income
Amount of Deposits
Trust Publications
seminar fees and sales of
Citizens #00095701
packages
$  92,127.20
Trust Publications
seminar fees and sales
Snook #10-0030-6-01
of packages
152,244.90
Trust Publications
interest per Form 1041
788.00
#60-0207-2-01
Total taxable deposits
$ 245,160.10 Less trustee fees per return
(22,005.45)
Total unreported income
$ 223,154.65 Year:     1978
Account Name and Bank
Type of Income
Amount of Deposits
Trust Publications
seminar fees and sales of
Citizens #00095701
packages
$  24,106.50
Trust Publications
seminar fees and sales of
Snook #10-0030-6-01
packages
112,496.52
Trust Publications
seminar fees and sales of
Univ. #403-563-0
packages
347,154.60
Yellow Rose
interest from house sale
Univ. #403-906-1
and deposits from
unexplained sources
10,187.79
Lark Enterprises
rent/fireworks display
200.00
Univ. #402-388-3
Trust Publications
interest per Form 1041
471.00
#60-0207-2-01
Total taxable deposits
$ 494,616.41 Less trustee fees per return
(14,938.00)
Total unreported income
$ 479,678.41 Year:     1979
Account Name and Bank
Type of Income
Amount of Deposits
Trust Publications
seminar fees and sales of
Snook #10-0030-6-01
packages
$   1,000.00
Trust Publications
seminar fees and sales of
Univ. #403-563-0
packages
937,221.39
Trust Publications
interest per Form 1041
922.00
#60-0207-2-01
Yellow Rose
interest from house sale
Univ. #403-906-1
and deposits from
unexplained sources
7,340.04
Lark Enterprises
rent/fireworks display
400.00
Univ. #402-388-3
Southern Utilities
cash and deposits from
Univ. #403-324-7
unexplained sources
3,946.34
Total taxable deposits
$ 950,829.77 Less trustee fees per return
(22,300.00)
Total unreported income
$ 928,529.77 OPINION Sham Trusts
Petitioners *337 bear the burden of proving that respondent's determinations as to income tax deficiencies are incorrect. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Petitioners contend that the trusts they established were not shams but had economic validity. *338 They argue that the proper test to be applied in determining the validity of a business organization is whether it either had a business purpose or carried on a business activity or a business for profit. Petitioners argue that their trusts engaged in business activity and should be recognized for Federal income tax purposes. Respondent contends that the trusts are shams for Federal tax purposes because petitioners maintained unrestricted control of the trusts through their roles as trustees, directly or indirectly, of the trusts. Respondent further contends that the trusts are shams for Federal tax purposes because petitioners remained in total control of and used for their own purposes the assets held in the names of the trusts. This personal *339 utilization of the assets of the trusts includes paying petitioners' personal living expenses and other personal expenses with those assets. Respondent further contends that the seminar fees and related income were earned by petitioner, and the various trust arrangements were merely an attempt at an anticipatory assignment by petitioner of his income. Alternatively, respondent contends that the trusts are subject to the grantor trust provisions of sections 671 through 677. In response, petitioners argue that the trusts were not true trusts but were valid business organizations often referred to as Massachusetts business or common law trusts. Section 61(a) provides that gross income includes all income from whatever source derived, including compensation for services, fees, commissions, or gains derived from dealings in property. Fundamental to this principle is that income is taxable to the person who earns it. Lucas v. Earl, 281 U.S. 111, 74 L. Ed. 731, 50 S. Ct. 241 (1930). A taxpayer has a right to minimize his taxes or avoid them totally by any means which the law permits. Gregory v. Helvering, 293 U.S. 465, 469, 79 L. Ed. 596, 55 S. Ct. 266 (1935). However, where entities are created which *340 have no real economic effect and which affect no cognizable economic relationships, the substance of a transaction involving those entities will control over its form. Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980). It is, therefore, unnecessary to decide whether petitioners' trusts had separate existence under State law or whether they are in form, a trust, a common law business trust, or some other form of jural entity. Zmuda v. Commissioner, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). We again must face the question of whether "Dahlstrom trusts" (sometimes referred to as "ALA trusts") should be recognized for Federal income tax purposes in a case involving the creator of the Dahlstrom trust concept. On brief, the only Dahlstrom trust case cited by petitioner and negatively criticized by petitioner as applying the wrong test is this Court's opinion in Tatum v. Commissioner, T.C. Memo 1988-579. The Fifth Circuit (the Court of Appeals to which an appeal in *341 this case would lie) affirmed Tatum without published opinion, 886 F.2d 1313 (1989). As in Tatum, we will apply the principles set forth in the Dahlstrom trust cases. Although their case involves a multitude of Dahlstrom trusts, petitioners have not distinguished their case from those in which this Court and others have found Dahlstrom trusts with virtually identical terms and similar formation not recognizable for Federal income tax purposes. Sandvall v. Commissioner, 898 F.2d 455 (5th Cir. 1990), affg. two Memorandum Opinions of this Court; [7] *342 Akland v. Commissioner, 767 F.2d 618 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Professional Services v. Commissioner, 79 T.C. 888 (1982). [8] As in those cases, we again refuse to recognize petitioners' type of trust arrangement scheme for Federal income tax purposes.
Petitioners were instrumental in the creation of all the trusts involved in their multitiered arrangement. Petitioners, as trustees, retained complete control and authority over all assets held in the name of all trust organizations in their scheme. No other person had any substantial function in the creation or operation of any trust organization. Petitioners and their family were the beneficiaries of all the trusts *343 they created and used in their scheme. No other person held any substantial beneficial interest in any trust organization used in petitioners' scheme. There was no economic change, nor any independent economic interest created in anyone other than petitioners under the trusts. Therefore, petitioners' trusts are nullities for Federal income tax purposes. Sandvall v. Commissioner, supra; Zmuda v. Commissioner, supra; Professional Services v. Commissioner, supra.
Other factors reinforce our decision to disregard petitioners' trust scheme. Aside from the income-producing assets and unexplained deposits, petitioner's seminars and sale of the tax package provided the sole source of funds and assets held and passed through Trust Publications, ICH, ISI, and Val in non-arm's-length transactions. Petitioners employed Yellow Rose, Lark, Southern, and other trusts to transfer assets in non-arm's-length transactions back and forth, creating layers of documentation to impede any examination or investigation. Petitioner used a "copy-not" type of pen for writing and endorsing checks to make invisible on photocopies the payees and amounts of the checks. *344 This device was also used in Ripley v. Commissioner, T.C. Memo 1987-114. Petitioners used the trusts to purchase and hold title to their homes, their furnishings, their vacation home, their cars, and their boats. These assets were regularly used by petitioners for their personal benefit, and petitioners used funds from the trusts to pay personal expenses. Markosian v. Commissioner, supra at 1243. It is clear that the trusts existed for no reasons other than for petitioners to manage their personal affairs and business assets, and as contrivances to avoid taxes while doing so. Petitioners owned and enjoyed the income, funneled through the layers of trusts and paperwork they generated to disguise or hide their income, and they are taxable on that income. Lucas v. Earl, supra. To sum up with the words of the Fifth Circuit in Sandvall v. Commissioner, 898 F.2d at 459: "Legal smoke and mirrors, reams of paper, and strings of words will suffice no longer to evade or delay the payment of their fair share of federal income taxes. The time has come for them to join the rest of their fellow citizens *345 at the annual income roundup." Petitioners neither claimed nor substantiated any deductions in connection with their unreported income during the taxable years in issue. In 1979, petitioner made a $ 21,866 payment of income taxes with the Form 1041 for Trust Publications. Since this is one of his sham trusts, this payment should be considered as made by petitioner and credited against petitioners' 1979 income tax liability. [9] Except for this adjustment, respondent's position on this issue is sustained. In view of our conclusion, we do not need to address respondent's alternative argument under the grantor trust provisions of sections 671 through 677. Loss Deductions
Because we find petitioners' scheme of trusts *346 a nullity for Federal income tax purposes, we likewise find the claimed losses incurred by petitioners upon the purported transfer of Clear Gold trust certificates to be invalid deductions. Petitioners merely transferred those trust certificates between trusts which they controlled. Petitioners orchestrated the transactions solely for the benefit of tax losses. Even if we did not find petitioners' trusts to be without economic substance, we would be hardpressed to find validity in transactions where a taxpayer willingly purchases assets and immediately resells them to a controlled entity for a fraction of their cost. This is clearly a sham transaction. Sandvall v. Commissioner, 898 F.2d at 458. We uphold respondent's disallowance of these loss deductions. Additions to Tax
Petitioners claim the same facts and evidence before this Court were before the Ninth Circuit in United States v. Dahlstrom, 713 F.2d 1423 (1983). That is not correct. Contrary to petitioners' claim, the Ninth Circuit made no ruling as to Trust Publications. The Ninth Circuit did not have before it evidence of petitioners' personal income tax liability, their *347 assignment of income to Trust Publications, their individual use of foreign and domestic trusts, and the ultimate use of trust assets for petitioners' personal benefit. In Dahlstrom, the Ninth Circuit reversed the criminal conviction of Karl Dahlstrom (petitioner in this case) for, among other things, advocating the ALA tax shelter program during 1976 through 1979. The Ninth Circuit in Akland v. Commissioner, 767 F.2d at 621-622, upheld this Court's finding that the taxpayers in that case were liable for civil fraud additions to tax for 1976 through 1979 and distinguished its Dahlstrom opinion on a number of grounds. The Ninth Circuit explained that criminal fraud must be proved "beyond a reasonable doubt" whereas the test for civil fraud is "clear and convincing evidence" of fraud. It also stated that its Dahlstrom opinion involved an abstract program whereas in Akland, as here, there were specific facts to consider. The Ninth Circuit further explained that its Dahlstrom opinion did not hold that the method of transferring money into the overseas trusts cannot be evidence of fraud. We agree with the Ninth Circuit in Akland that its *348 opinion in Dahlstrom is distinguishable, and we further find that this applies even as to petitioner because we are here concerned with civil fraud based on the specific facts relating to the actions of petitioner. The dissenting judge in the Ninth Circuit's Dahlstrom opinion subsequently referred to the ALA programs in another opinion by stating that "At the heart of these tax avoidance schemes were three foreign trusts." United States v. Brodie, 858 F.2d 492, 497 (9th Cir. 1988). As claimed by petitioner, the word "legitimate" preceded the phrase "tax avoidance schemes" in the Brodie opinion, filed September 21, 1988, but it is obvious that the Ninth Circuit struck that word from its opinion, as amended November 16, 1988. United States v. Brodie, supra, does not aid petitioner, and we must decide whether petitioner is liable for the additions to tax under section 6653(b). Section 6653(b) imposes a 50-percent addition to tax on an underpayment of tax for a year in which any part of the underpayment is due to fraud. The burden of proving fraud by clear and convincing evidence is on respondent. Sec. 7454(a); Rule 142(b); *349 Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). When fraud is determined for more than one taxable year, respondent must show that an underpayment exists and that some part of the underpayment was due to fraud for each taxable year in issue for the corresponding addition for fraud for each such year to be upheld. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). Respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be determined from the entire record. Kotmair v. Commissioner, 86 T.C. 1253, 1259 (1986); Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Because fraud can seldom be established by direct proof of intention, circumstantial evidence is permitted, and fraud may be properly inferred where a taxpayer's entire course of conduct establishes the necessary intent. Kotmair v. Commissioner, supra at 1260; *350 Wilson v. Commissioner, 76 T.C. 623, 633 (1981). Petitioner's activities in succeeding years cast a light on conduct in prior years. Estate of Upshaw v. Commissioner, 416 F.2d 737 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; Smith v. Commissioner, 32 T.C. 985 (1959). Upon review of the record, we conclude that petitioner's underpayments for all the years in issue were due to fraud. Among the factors we considered in arriving at this conclusion was petitioner's lack of economic foundation for the existence of, and the many transfers between, the trusts he used as conduits in his scheme. He used numerous trusts and numerous bank accounts to hide his earnings from lectures and sales to the ALA members in order to avoid tax on those amounts. He used cashier's checks and certificates of deposits to obscure the source of funds. He would deposit checks made to one payee into another account for the same reason. Petitioner used the many trusts to hold title to his property. Petitioners' homes, summer home, cars and boats were all titled in the name of one trust or another, and petitioners used these properties *351 for their personal use in the years in issue and in subsequent years. The trusts established by petitioner were without economic substance and were merely a scheme to evade tax. Petitioners failed to report income of $ 223,154.65, $ 479,678.21, and $ 928,529.77 for the years 1977, 1978, and 1979, respectively. A consistent pattern of failing to report substantial amounts of income over a period of several years is persuasive evidence of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. This Court has characterized petitioners' repeated responses to respondent's discovery requests with frivolous objections and numerous spurious motions as dilatory tactics. Dahlstrom I, 85 T.C. at 819. Petitioner's response to the Court's Rule 91(f) order to show cause was evasive and not fairly directed to the proposed stipulation of facts. Petitioner attempted to obfuscate respondent's examination, which included the use of the "copy-not" type of pen. Petitioner asked at least two persons not to furnish records to respondent's agent. Petitioner did not provide some records until trial and only *352 after the Court directed him to do so. Such failure to cooperate with respondent's agents is another indication of fraudulent intent by petitioner. Millikin v. Commissioner, 298 F.2d 830, 836 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Baumgardner v. Commissioner, 251 F.2d 311, 323 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Professional Services v. Commissioner, 79 T.C. at 933. In 1977, petitioner made purported transfers of Clear Gold trust certificates solely for the creation of tax losses. The entire record, and petitioner's course of conduct as documented, clearly and convincingly show that the underpayments resulted from petitioner's actions which were intentional and were designed to evade taxes he knew to be owing. Professional Services v. Commissioner, 79 T.C. at 931; Marshall v. Commissioner, 85 T.C. 267, 272 (1985). Petitioner is liable for the additions to tax under section 6653(b) for the years in issue. Statute of Limitations
Petitioners claim that respondent is precluded from assessing and collecting any deficiency for 1977 and *353 1978 because the period of limitations with respect to assessments is 3 years from the date the return is filed. Sec. 6501(a). Because the date of issuance of the notice of deficiency is April 15, 1983, petitioners claim that the taxable years 1977 and 1978 are barred by the statute of limitations. There is no limit on the period of time in which the assessment and collection of tax can be made for a particular taxable year when a fraudulent Federal income tax return is filed for that year. Sec. 6501(c)(1); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160, 164 (1976). Where a joint return has been filed, fraud by one spouse is sufficient to lift the statute of limitations against both spouses. Ballard v. Commissioner, 740 F.2d 659, 663 (8th Cir. 1984), affg. in part and revg. in part a Memorandum Opinion of this Court; Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970). Because we have found that petitioner filed fraudulent Federal income tax returns for the years 1977 and 1978, the statute of limitations does not bar respondent's assessment and collection of petitioners' Federal income tax liability for those *354 years. Even if we had not found fraud on the part of petitioner, the 6-year statute of limitations under section 6501(e)(1) would apply because petitioners' unreported income of $ 223,154.65 and $ 429,678.41 for 1977 and 1978, respectively, exceeds 25 percent of the gross income of $ 42,635 and $ 14,943 reported on the 1977 and 1978 Federal income tax returns. Respondent issued the notice of deficiency on April 15, 1983, which is less than 6 years from on or about April 17, 1978, and on or about April 16, 1979, the dates petitioners filed their returns for 1977 and 1978, respectively. Aside from fraud, respondent's notice of deficiency with respect to 1977 and 1978 is not barred by the 6-year statute of limitations under section 6501(e)(1). Decision will be entered under Rule 155. Footnotes
1. The Form 1041 also shows returns and allowances of $ 50,450, but because the record does not show whether or not such amounts were deposited, we have used the higher gross receipts amount.↩
2. Why the total receipts for 1977 and 1979 as reported on the Forms 1041 were not reflected in the total deposits is not shown in the record.↩
3. Petitioners' Jeanette Louis Trust does not follow this format but similarly grants petitioners unrestricted authority as trustees.↩
4. The name International Clearing House had been lined out and Pan-Am Automobile Insurance Company had been typed on the Declaration of Trust. All other references in the record are to International Clearing House, and petitioner admitted that this was the correct title.↩
5. Although there is no declaration of trust in the record for Real Properties, nothing in the record indicates it was different from the other trust organizations.↩
6. Petitioner Karl L. Dahlstrom makes no claims that these amounts were included in reported trustees fees on his 1977, 1978, and 1979 returns. On the contrary, he claims he "acted as agent or trustee."↩
7. On a consolidated appeal, Sandvall v. Commissioner, 898 F.2d 455 (5th Cir. 1990), affirmed two cases, Sandvall v. Commissioner, T.C. Memo 1989-56 and Sandvall v. Commissioner, T.C. Memo 1989-189↩.
8. See also Able Company v. Commissioner, T.C. Memo 1990-500; Tatum v. Commissioner, T.C. Memo 1990-119; Tatum v. Commissioner, T.C. Memo 1988-579, affd. without published opinion 886 F.2d 1313 (5th Cir. 1989); Drager v. Commissioner, T.C. Memo 1987-483; Ripley v. Commissioner, T.C. Memo 1987-114; Estate of Yeoham v. Commissioner, T.C. Memo 1986-431, affd. without published opinion 826 F.2d 11 (5th Cir. 1987); Akland v. Commissioner, T.C. Memo 1983-249, affd. 767 F.2d 618↩ (9th Cir. 1985).
9. Petitioner reported a "0" tax liability on the income tax returns for Yellow Rose Properties for 1978, 1979, and 1980, for Southern Utilities Company for 1979 and 1980, and for Lark Enterprises for 1980. The record contains no income tax returns for Lark Enterprises for 1977, 1978, and 1979.↩